PEOPLE v CARLIN (ON REMAND)

Docket Nos. 186263, 190563. Submitted April 16, 1999, at Lansing. Decided
    December 10, 1999, at 9:00 A.M.

Gerald L Carlin, a deputy sheriff in Oakland County and a former
    commander of its Rochester Hills substation, was charged with six
    counts of the common-law offense of misconduct in office. The 52-
    3 District Court, Ralph H. Nelson, J., bound Carlin over on five of
    those counts. The Oakland Circuit Court, Deborah A. Tyner, J.,
    granted Carlin's motion to dismiss the five counts on which he had
    been bound over, holding that Carlin was not a public official and
    thus could not be charged with misconduct in office. The prosecu-
    tion appealed. (Docket No. 186263).

    In a separate indictment, Carlin was charged with fourteen
    counts of misconduct in office and one count of the removal, muti-
    lation, or destruction of public records. The 52-3 District Court,
    Ralph H. Nelson, J., dismissed all fourteen counts of misconduct in
    office, holding both that Carlin was not a public official who was
    subject to prosecution of misconduct in office and that no malfea-
    sance, misfeasance, or corrupt intent was involved, and dismissed
    the count of destruction of public records, finding that the time
    slips that were allegedly destroyed were not public records. The
    Oakland Circuit Court, Deborah G. Tyner, J., affirmed. The prosecu-
    tion appealed by leave granted. (Docket No. 190563).

    The appeals were consolidated. The Court of Appeals, WAHLS and
    GAGE, JJ. (M.J. KELLY, P.J., dissenting in part), affirmed, holding that
    an Oakland County deputy sheriff is a public employee, not a pub-
    lic official and, accordingly, the circuit and district courts did not
    abuse their discretion by dismissing the misconduct charges and
    that the time slips at issue were not official records but were
    merely notes or internal memoranda that were kept until the offi-
    cial records were entered into the computer system. 225 Mich App
    480 (1997). The Supreme Court reversed, holding that a deputy
    sheriff is a public official for the purpose of the common-law
    offense of misconduct in office when the allegations supporting the
    charge arose from the performance of the deputy sheriff's duties,

and remanded the matter to the Court of Appeals. 459 Mich 348 (1999).

On remand, the Court of Appeals *held*:

1. The circuit court's dismissal of the five counts of misconduct in office in Docket No. 186263 turned solely on the circuit court's determination that Carlin, as a deputy sheriff, was not a public official within the meaning of the common-law offense of misconduct in public office. The Supreme Court having now held that a deputy sheriff is a public official where the alleged misconduct arises from the performance of the deputy's duties, it is necessary to remand the matter to the circuit court for further proceedings concerning those charges.

2. Because in Docket No. 186263 the charge of destruction of public records and the fourteenth count of misconduct in office, which alleged misconduct in office on the basis of the destruction of public records, were resolved by the Court of Appeals in its prior opinion on a basis that was not addressed by the Supreme Court in its decision in this matter, the decision of the Court of Appeals to affirm the circuit court's affirmance of the district court's dismissal of those charges needs no further review.

3. There are four elements of the common-law offense of misconduct in office: the person must be a public officer, the conduct must be done in the exercise of the duties of the office or done under the color of the office, the conduct must be malfeasance or misfeasance, and the conduct must be corrupt behavior.

4. With respect to the remaining thirteen counts of misconduct in office in Docket No. 186263, the district court not only held that Carlin was not a public officer, thus negating the first element of the offense, but also went on to make findings regarding the remaining elements of the offense. The district court found on the basis of the evidence presented that, at time of the undertaking of the acts on which the charges were based, there were no specific regulations prohibiting the transporting of civilians in police vehicles driven by sheriff's department personnel. Accordingly, the district court held that Carlin's ordering of other deputy sheriffs to transport various civilians could not be said to amount to malfeasance or misfeasance. On those proofs, the district court did not abuse its discretion in finding no malfeasance or misfeasance and, accordingly, in refusing to bind over the defendant with respect to those thirteen counts of misconduct in office. Therefore, the circuit court did not err in affirming the district court's refusal to bind over the defendant on those thirteen counts.

Affirmed in part and remanded in part.

1. SHERIFFS AND CONSTABLES — DEPUTY SHERIFFS — PUBLIC OFFICIALS — MIS-
CONDUCT IN OFFICE.

A deputy sheriff is a public official for the purpose of the common-
law offense of misconduct in office where the alleged misconduct
arises from the performance of the deputy's duties.

2. PUBLIC OFFICERS — COMMON-LAW OFFENSES — MISCONDUCT IN OFFICE.

There are four elements of the common-law offense of misconduct in
office: the person must be a public officer, the conduct must be
done in the exercise of the duties of the office or done under the
color of the office, the conduct must be malfeasance or misfea-
sance, and the conduct must be corrupt behavior.

*Jennifer M. Granholm*, Attorney General, *Thomas
L. Casey*, Solicitor General, and *Timothy A. Baugh-
man*, Assistant Prosecuting Attorney, for the people.

*Thomas Kizer, Jr.*, for the defendant.

ON REMAND

Before: KELLY, P.J., and MCDONALD and GAGE, JJ.

KELLY, P.J. These consolidated cases are before this
Court for the second time pursuant to the Supreme
Court's decision in *People v Carlin*, 459 Mich 348; 589
NW2d 458 (1999). The Supreme Court has deter-
mined that defendant, an Oakland County deputy
sheriff, is a public official and, as such, is subject to
the catch-all provision found in MCL 750.505; MSA
28.773[1] for the common-law offense of misconduct in

---

[1] MCL 750.505; MSA 28.773 states:

Any person who shall commit any indictable offense at the com-
mon law, for the punishment of which no provision is expressly
made by any statute of this state, shall be guilty of a felony, punish-
able by imprisonment in the state prison not more than 5 years or
by a fine of not more than $10,000.00, or both in the discretion of
the court.

office.[2] Pursuant to the Supreme Court's decision, we now address the remainder of plaintiff's claims on appeal.

FACTUAL AND PROCEDURAL BACKGROUND

In Docket No. 186263, defendant was charged with six counts of the common-law offense of misconduct in office in conjunction with MCL 750.505; MSA 28.773. All six counts corresponded to monthly memoranda submitted by defendant to Oakland County in April, July, August, September, October, and November 1992 reporting the overtime hours accumulated by Oakland County sheriff's deputies stationed at the Rochester Hills substation. These amounts were to be charged to the city. Each count alleged that defendant underreported the amount of overtime chargeable to Rochester Hills, resulting in a loss of approximately six thousand dollars to Oakland County.

Joseph Quisenberry, a lieutenant with the Oakland County Sheriff's Department, then assigned as station commander at the Rochester Hills substation, testified that between January 1991 and December 1992 the city of Rochester Hills contracted with Oakland County for the sheriff's department to provide police services within the city.[3] The overtime process

---

[2] To find a defendant guilty of the criminal offense of misconduct in office, the defendant must be found to be a "public officer," who while acting "in the exercise of the duties of his office or while acting under color of his office," did "any act which is wrongful in itself—malfeasance," did "any otherwise lawful act in a wrongful manner—misfeasance," or failed to "do any act which [was] required of him by the duties of his office—nonfeasance." Perkins & Boyce, Criminal Law (3d ed), p 540.

[3] The city had a "no-fill contract" with the county, which meant they were contracting for a certain level of staffing, which stayed constant throughout the length of the contract. If a deputy missed a day, the county was not required to send a replacement as they would under a "fill contract." In a no-fill contract, if a deputy worked overtime, the station

involved the deputies completing overtime slips with their name, social security number, date, hours worked, and the reason for the hours worked. Lieutenant Quisenberry further testified that there was no reason for a deputy not to report fully the extent of the overtime worked unless it was for legitimate exceptions such as contracts with Pine Knob, Meadowbrook, or the Pontiac Silverdome. According to the sheriff's department's general order 21, the station commander had a duty to review and document all overtime and to report the amount of overtime to the administrative services department of the sheriff's department.

The evidence and testimony presented to the district court indicated that defendant often modified overtime reports to reflect a lower amount of overtime that was to be charged to the city. Testimony from the sheriff's department's office manager, Dale Cunnigham, established that while the no-fill contract was silent concerning whether the city was to reimburse the county for overtime worked in the city, there was an agreement between the city and the county that the city would reimburse the county for such overtime. This was never formalized in a written agreement. It was not until 1994 that such a policy was memorialized in a contract between the city and the county for the use of sheriff's deputies within Rochester Hills city limits.

After hearing arguments from both sides, the district court dismissed count one involving the alleged underreporting of overtime by sixty dollars. The court

commander reported to the sheriff's department what overtime had been worked and to whom it should be billed.

stated that it could not find the corrupt motive necessary for the charge of misconduct in public office. The district court bound defendant over for arraignment on counts two through six. Defendant then filed a motion in the circuit court to dismiss these five charges. The circuit court concluded that defendant was not a public official and, therefore, could not be charged with the common-law offense of misconduct in public office.

In Docket No. 190563, defendant was charged with fourteen counts of misconduct in public office in conjunction with MCL 750.505; MSA 28.773, and one count of removal, mutilation, or destruction of public records, MCL 750.491; MSA 28.759. The first thirteen counts of misconduct in office stem from defendant's alleged actions of ordering two deputy sheriffs to drive L. Brooks Patterson, then a candidate for county executive, his wife, or Rudy Lozano, chairman of the Oakland County Road Commission, to various locations or events. The remaining count of misconduct in office and the count of destruction of public records stem from defendant's alleged destruction of "comp time" records for one of the two deputies.[4]

Tim McIsaac, a sergeant with the sheriff's department, testified that on August 31, 1992, he was stationed at the Rochester Hills substation under the

---

[4] The remaining count of the common law offense of misconduct in public office and the count of destruction of public records, MCL 750.491; MSA 28.759, have been adequately addressed by this Court in its previous decision. 225 Mich App 480; 571 NW2d 742 (1997). Because the Supreme Court's decision in this case did not address the status of the comp-time slips and tally sheets, we decline to further review this claim on appeal and continue to affirm the circuit court's determination that the district court did not err in dismissing the charges of misconduct in public office and destruction of public records as they related to the comp-time slips and tally sheets.

command of defendant and was attending an all-day training seminar. During a morning break, defendant told McIsaac to change into plain clothes and pick up Rudy Lozano and Mark Turnbull, who was the nephew of Major Matheny of the sheriff's department, at Detroit Metropolitan Airport. Defendant told McIsaac that their flight would arrive at 12:50 P.M. McIsaac was told to drive an unmarked beige station wagon, which was owned by the city of Rochester Hills. If the driving task took longer than his usual shift, McIsaac was to submit a comp-time request, which would allow him to take paid time off at a later time. McIsaac drove both men from the airport to Waterford and submitted a comp-time request the following day, which he computed at 1.5 hours for each hour worked past the end of his shift. The prosecution informed the court that this testimony referred to count nine in the complaint against defendant.

Under cross-examination, McIsaac admitted that he drove outside Oakland County on at least one previous occasion, when he drove his supervisor's son from a hospital to his home. McIsaac testified that this type of work was normally done "at a request of a supervisor and I'd just be following instructions or orders." He did not believe that the request was improper.

James English was a deputy sheriff assigned to the detective bureau in Rochester Hills in 1991 and 1992, where he had reported to defendant. The prosecutor informed the court that English's testimony supported counts one through eight and ten through thirteen. The events surrounding the charge for count one occurred on December 10, 1991, when English was working in plain clothes in a surveillance unit after

his normal shift hours. He was driving a maroon Bonneville that was owned by the city of Rochester Hills. Defendant called English on the car phone and told him to pick up L. Brooks Patterson and his brother-in-law at the Holiday Inn at I-75 and Opdyke Road in Auburn Hills and drive them to a hockey game at Joe Louis Arena in Detroit. Defendant informed English that he would be paid in comp time for any extra time that he spent driving Patterson. English dropped the two men at Joe Louis Arena and drove back to Rochester Hills to continue his surveillance work.

The events charged in count two occurred on March 17, 1992, after English's regular shift. The previous day, defendant had told English to drive to Al Dittrich's car dealership, pick up a van that would be waiting for him, and proceed to Dittrich's residence where Dittrich and Patterson would be waiting for him. Because English would be driving when he was off-duty, defendant told him that he would be paid either in comp time or by Dittrich. English drove the two men to the Airport Inn in Waterford, where a few other men joined them, and then drove the group to Nemo's bar in Detroit. English transported some individuals back to Oakland County and arrived at his home at approximately 2:00 A.M. English submitted a comp-time request for eight hours as compensation. He also received a $125 check from Dittrich. Defendant told him that he could keep the check.

English had scheduled a paid vacation for the week of April 26, 1992. Counts three through seven involved English's driving duties that week. Defendant had given English a schedule of events for which English would drive Patterson in exchange for comp

time. On April 26, English picked up a van from Dittrich's dealership and drove Patterson and his wife from their home in Waterford to a fund raiser at the Birmingham Country Club. After the event was over, English drove them home. He submitted a comp-time request to defendant for the hours he had spent driving..On April 27, English picked up Mrs. Patterson at her home and drove her to the Silverdome in Pontiac. He waited for her and drove her back to her residence. Later in the evening, he drove both of the Pattersons to the Atrium Restaurant in Southfield. Afterward, he drove the Pattersons to their residence. Again, English submitted a comp-time slip for the time he had spent driving.

On April 28, English picked up Patterson at his residence and drove him to the Elks' Club in Rochester. He waited until the event was over and drove Patterson home. He submitted a request for four hours' comp time. On April 29, English again drove to the Patterson home and transported Mrs. Patterson to Picano's in Troy. Afterward, he drove Mrs. Patterson home. He requested three hours' comp time for his driving services. On the evening of April 29, English drove Mr. and Mrs. Patterson from their home to a fund raiser at Trade-Winds Aviation at the Pontiac Airport. Although English waited for the Pattersons, they received a ride from someone else and English returned home. English submitted comp-time requests for his time.

On April 30, English drove the Pattersons from their home in Waterford to the Ultimate Sports Bar in Pontiac. He waited for them and drove them home. He again submitted a comp-time request for his driving.

Sometime in August 1992, defendant asked English to work the day shift on August 28. That day English was in full uniform and driving a marked patrol car. At defendant's request, he picked up Rudy Lozano in Waterford and, at Lozano's direction, drove to another Waterford location to pick up another man. He drove the two men to Detroit Metropolitan Airport. On his activity log sheet, English indicated that he was on "detail" from 6:20 A.M. to 10:10 A.M., the hours he spent driving to the airport.

Some time in October 1992, while on duty, English met Patterson at a restaurant in Waterford at the request of defendant and followed Patterson and a female companion to Lansing. He waited for them in the waiting room of an Internal Revenue Service office and then drove Patterson to the capitol building for a meeting with the Governor. After that meeting, English drove Patterson back to the restaurant in Waterford.

On October 10, 1992, at defendant's request, English met several citizens at the Airport Inn in Waterford while he was on duty. Among the group were Dittrich, Lozano, and Mike Zender, Patterson's campaign secretary. He drove them in a van belonging to Dittrich to a birthday party for Governor Engler in Lansing and drove them back to Waterford after the party.

On November 23, 1992, at the request of defendant, English drove several citizens, including Dittrich, Zender, and Lozano, from the Holiday Inn on I-75 to a fund raiser for Gil Hill in Detroit. After the event, he drove the group back to the Holiday Inn. English received comp time for his driving.

On November 25, 1992, English received a telephone call from Marilyn Plaunt who instructed him to go to Sergeant Miller's residence to pick up Miller's city-owned vehicle. He then drove to the Patterson residence. English drove the Pattersons in a van that was parked at their house to Cobo Hall for a fund raiser for the poor.

English testified that the sheriff's department had no policy prohibiting deputies from driving other deputies or public officials, and he was not aware of any policy prohibiting the driving of private citizens. English believed he had done nothing inappropriate, and no one in the department said anything to him about his driving. English knew that Lozano was on the county road commission and that Patterson was at the time running for county executive. He was aware that threats had been made against Patterson's life and that part of his function in driving both men was to provide security. When he began working for the sheriff's department, English was given a book of rules and regulations. Rule 157 in the book provided, "Members shall not shop, barter or trade while on duty, nor devote any of their on-duty time to any activity other than that which pertains to their work." After defendant was charged in the instant case, the department instituted policies about driving citizens.

Rudy Lozano testified that he was chairman of the board of the Oakland County Road Commission. Sometime in 1991 defendant had come to his office and introduced himself. Defendant indicated that the sheriff had told him to speak with Lozano, that defendant had political aspirations to run for sheriff when Sheriff John Nichols retired, and that defendant wanted to learn how to run a campaign. After check-

ing with the sheriff, Lozano invited defendant to organizational meetings and some staff meetings at Patterson's campaign headquarters. Defendant organized a successful fund raiser for Patterson at the Atrium Restaurant in Southfield, which grossed over $50,000. At some point, defendant approached Lozano about some other law enforcement people who were interested in becoming involved in Patterson's campaign, and they set up a meeting. Lozano did not recall whether English attended this meeting. He was "looking for police officers that were willing to help protect [Patterson's] back. That's what I wanted them involved for and that's what I stated at the first meeting with these guys."

Lozano did not recall sending a fax to the Rochester Hills substation regarding airplane flights on August 28 and August 31. Asked if he had discussed the flights with defendant, Lozano testified, "Well, see, I don't recall. I mean, there were other deputies that—that took me to the airport, too, and I don't ever remember sending a fax, I don't ever remember calling them." Lozano did not recall defendant ever arranging rides for him. He stated that he thought that English called him and asked if he needed a ride to the airport. The particular flights in question were to and from Florida, and the trip was a vacation. Lozano had never discussed with defendant an endorsement from Patterson in defendant's bid for sheriff, but was aware that Patterson had endorsed defendant when he ran for the county commission.

Oakland County Sheriff John Nichols testified that he was "the chief policy maker" of the sheriff's department. He stated that there were "many variations" to the department's policy about "doing com-

pany work on company time." Asked whether a commanding officer ordering a subordinate who was on duty to drive a private individual to a private function outside the jurisdiction of the subordinate would be a deviation from the department's policy, Nichols responded: "Only if there were inherent in that a need for a police presence during the drive. If the individual had a threat against his life, if it was an emergency, a doctor responding in a snowstorm to a patient. Under those circumstances, yes." He stated that he would not authorize overtime to be paid for a duty performed outside a police service. The department had no general policy about transporting private individuals.

Under cross-examination, Sheriff Nichols was asked what policy existed in 1991 and 1992 regarding restrictions on deputies driving county personnel other than law enforcement personnel. He responded: "I don't know whether it's a written policy or not, I think there's a regulation that says you shan't transport anybody except in police business. . . . I think there was a regulation that said it, there wasn't a policy. . . . And I'm not even certain of the regulation." Nichols admitted that during a prior investigatory proceeding, he had stated that there were no rules about transporting people for other than law enforcement purposes and that it was "a matter of judgment." Asked if a policy had been instituted after the prosecutorial investigation, Nichols responded: "A lot of changes have been made. I don't know if that was one of them or not."

Nichols stated that he had been driven to court that day by an on-duty deputy, that he had allowed deputies to drive him for "duty-related functions," and that

he had allowed off-duty deputies to drive him for "personal functions." Sheriff Nichols noted that L. Brooks Patterson had been deputized and was a regular deputy during 1992. He also stated that Rudy Lozano was on the county road commission and that, in his opinion, it would be acceptable for a deputy to drive Lozano to the airport if it was "official county business." A Florida destination would not indicate to him whether the individual was conducting county business or not. Further, Nichols stated that driving Lozano to the airport when he was not conducting county business would be "questionable." Asked if he would consider it appropriate to use county-paid employees to assist in facilitating a county official's reelection, Nichols replied, "During the years that I have spent in public life, it seems to be quite an acceptable practice not only in this county but in other counties."

On November 2, 1994, the district court issued a written opinion in which it declined to bind over defendant on the first thirteen counts of misconduct in office on the basis of its findings that defendant was not a public officer and that the prosecution had not shown evidence of misfeasance or malfeasance on the part of defendant. On January 18, 1995, the district court issued a second written opinion in which it declined to bind over defendant on the remaining count of misconduct in public office and the count of removal, mutilation, or destruction of public records because the prosecutor had failed to show that the comp-time forms were public records or that defendant was a public officer. On October 27, 1995, the circuit court issued an order affirming the district court's decision.

LEGAL ANALYSIS

In Docket No. 186263, the sole issue on appeal is whether defendant is a public official, for the purposes of allowing a common-law charge of misconduct in public office to be brought pursuant to the catch-all provision of the Criminal Code. The Supreme Court having answered this question in the affirmative, we must remand this case to the circuit court for further proceedings on counts two through six involving misconduct in public office.[5]

In Docket No. 190563, we review the district court's decision in refusing to bind over defendant on the first thirteen counts of misconduct in office.[6] While this is actually a review of the circuit court's decision to affirm the decision of the district court, this Court generally applies the same standard of review as applied by the circuit court in reviewing the district court's decision not to bind over a defendant. *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999). The circuit court may not substitute its judgment for that of the district court and may reverse only if it appears on the record that the district court abused its discretion. *Id.* " 'An abuse of discretion is found only where an unprejudiced person, considering the facts upon which the court acted, would say there was no justification or excuse for the ruling.' " *People v Mayhew*, 236 Mich App 112, 124; 600 NW2d

---

[5] We decline to review the district court's dismissal of count one because the issue has not been presented to this Court for review. *Jennings v Southwood (After Remand)*, 224 Mich App 15, 27; 568 NW2d 125 (1997), rev'd on other grounds, 457 Mich 884 (1998).

[6] The fourteenth and final count of misconduct in office related to the destruction of the overtime records. As noted in footnote 4, *ante* at 54, and in the preceding paragraph, that issue has been resolved by this Court's previous decision in this case.

370 (1999), quoting *People v Orzame,* 224 Mich App 551, 557; 570 NW2d 118 (1997). We affirm the decision of the circuit court.

The examining magistrate's function is "to determine whether a crime has been committed and whether there is probable cause for charging the defendant with that crime." *People v Harris,* 190 Mich App 652, 657; 476 NW2d 767 (1991). At the preliminary examination, the prosecution need not establish guilt beyond a reasonable doubt. *People v Fiedler,* 194 Mich App 682, 693; 487 NW2d 831 (1992). However, evidence regarding each element of the crime or evidence from which the elements may be inferred must exist. When the evidence conflicts or raises a reasonable doubt concerning guilt, there are questions for the trier of fact, and the defendant should be bound over. *Id.*

As noted in footnote 2, *ante,* at 52, the elements of the common-law offense of misconduct in office are (1) the person must be a public officer, (2) the conduct must be in the exercise of the duties of the office or done under the color of the office, (3) the acts were malfeasance or misfeasance, and (4) the acts must be corrupt behavior. Perkins & Boyce, Criminal Law (3d ed), pp 540-545. The district court recited these elements in its written opinion. While the district court held, and the circuit court agreed, that defendant was not a public officer, thus negating the first element of the offense, the district court went on to make factual findings regarding the remaining elements of the offense.

In determining whether there was sufficient evidence of either malfeasance or misfeasance, the district court again cited Perkins & Boyce, *supra* at 545:

> The distinction [between malfeasance and misfeasance] can be tested by assuming a county commissioner whose duties included the letting of contracts for public buildings and other work needed for county purposes, and who let a certain contract for the corrupt purpose of enriching a friend. If the contract was one which should not have been let at all the misconduct was malfeasance in office, whereas if the work was needed in the public interest, but the commissioner dealt only with his friend instead of offering the project for competitive bidding, as required by law in the jurisdiction, it was a case of misfeasance in office.

The court noted that none of the deputies who testified believed anything was wrong with the driving done by McIsaac and English, because none of those deputies knew of any sheriff's department practice or policy that would be violated by such an activity. Sheriff Nichols testified that he relied on his officers to use their common sense in exercising their discretion in the performance of their duties. Moreover, the court noted, there was testimony that defendant told the deputies that they were driving Patterson to provide security because there had been threats against Patterson's life. The sheriff stated that protecting even a private citizen against an imminent threat on his life was a valid sheriff's function and that he would have ordered deputies to drive if he was aware of an imminent threat.

The criminal charge of misconduct in office occurs

> when duties imposed by low have not been properly and faithfully discharged, and as being established by showing the willful violation of a prescribed duty. . . .

> \* \* \*

> . . . [T]he existence of a duty owed to the public is essential to be liable for misconduct in office, for otherwise the

offending behavior becomes merely the private misconduct of one who happens to be an official. [63C Am Jur 2d, Public Officers and Employees, § 371, pp 811-812 (1997).]

In order to find a public officer guilty of malfeasance, there must be established a "breach of a positive statutory duty" or "the performance of a discretionary act with an improper or corrupt motive." *Id.*, § 373, p 814.

Under cross-examination, Sheriff Nichols was asked what policy existed in 1991 and 1992 regarding restrictions on deputies driving county personnel other than law enforcement personnel. He responded: "I don't know whether it's a written policy or not, I think there's a regulation that says you shan't transport anybody except in police business. . . . I think there was a regulation that said it, there wasn't a policy. . . . And I'm not even certain of the regulation."[7] Nichols admitted that during a prior investigatory proceeding, he had stated that there were no rules about transporting people for other than law enforcement purposes and that it was "a matter of judgment." Further, during the preliminary examination it appears

---

[7] The district court questioned Sheriff Nichols about the policies of his office that lent credence to the fact that there was no departmental policy regulating when a citizen could be driven by an on-duty deputy sheriff. The exchange was as follows:

*The Court*: You said something about the inherent authority of the command officer to basically make common sense decisions and do what's right under the law.

*The Witness*: That's exactly what he's expected to do, yes, sir.

*The Court*: All right. And that's kind of where you were at before all these things came up as far as having written policies or verbal policies.

*The Witness*: Yes, sir.

*The Court*: You expected the officers to know their duty and do it?

*The Witness*: Yes, sir.

the prosecution was unable to succinctly state the county's position concerning what constitutes malfeasance or misfeasance in the instant situation.[8]

---

[8] The district court asked the prosecutor about his view of defendant's activities and at what point they became a crime. The following exchange took place:

*The Court*: Well, help me out. When is it a crime for the Deputy to drive somebody?

*Mr. Skrzynski*: Well—

*The Court*: Does it evolve around whether the person's a private citizen or not?

*Mr. Skrzynski*: Pardon?

*The Court*: Does it evolve around whether the person's a private citizen or not?

*Mr. Skrzynski*: I don't—not in my position, but that's the hypothetical that he's giving, and I'm just saying that the hypothetical—

*The Court*: So if he drives—

*Mr. Skrzynski*:—assumes facts that are not in evidence.

*The Court*: If he drives anybody it—it's a crime?

*Mr. Skrzynski*: Well, I'm gonna [sic] have testimony that's gonna [sic] establish what I believe the duty is, and I think that the testimony ought to establish that.

*The Court*: Well, I would like to know what you think the legal duty is so I can follow—that's the only way I can make determinations of relevancy of testimony. I—from—from all the cross-examination and direct examination of the witnesses so far I thought the prosecutor was taking the position that deputies could drive elected officials of the county and other deputies, but couldn't drive anybody else, and if—if I'm wrong I'd like to know because I can't make determinations of materiality or re—relevancy.

*Mr. Skrzynski*: I'm—I—that's—let—let me just say that that's—for the time being—you—the Court can assume that, what the Court has just said.

*The Court*: So your legal position is that legally they can drive elected officials of the county and other deputies, but no one else, or else they'd be committing a crime? I'm not trying to—

*Mr. Skrzynski*: No, you are, though, Judge—

*The Court*: No. Ex—

*Mr. Skrzynski*:—because because I'm telling you I've got a witness that says—

*The Court*: except for legitimate police purposes, I guess.

*Mr. Skrzynski*: Well—

The prosecution argues that the court did not address in its written opinion two of the counts filed against defendant: count eleven, which involved the Lansing trip for Governor Engler's birthday party, and count twelve, which involved a trip to Detroit for a fund raiser for Gil Hill. The prosecution argues that there could be no county business at either of these events, but only "a political purpose." However, there was no evidence presented that defendant had any reason to know whether county business occurred at these events. Moreover, as the district court observed, there was no department policy in place regarding when a private citizen could be driven by an on-duty deputy, and deputies who were ranking officers, as defendant was, were expected to use their own judgment on such matters. Therefore, as with the other counts, the prosecutor could not establish an essential element of the offense—that defendant had committed criminal malfeasance or misfeasance. Indeed, none of the prosecution's other complaints concerning the district court's factual findings relate

---

*The Court*: Okay, well, I'm not—not trying to put you on the—on the—

*Mr. Skrzynski*: I don't think that I should be, you know, giving the-the Court the testimony. I think that it should come from the witness.

The Court: I'm not asking you for the testimony, I'm asking you for the law, sir, what you think the law is.

*Mr. Skrzynski*: Well, I—

*The Court*: So, I'm—if—if you're not prepared to answer it, I'm not trying to cause a problem here, but you know, it just seems like when somebody writes a complaint they have an idea what the law is and they can state it for the Court to help the Court out. Maybe I'm wrong, I—I'm not trying to—I'm not trying to embarrass you or cause you a problem, really I'm not. So if—if the law is in flux here, and none of us have determined what the law is, then I guess I'm gonna have to allow a lot more questions than I thought I did.

to evidence demonstrating malfeasance or misfeasance, because none of the alleged errors or omissions pertain to evidence of an established departmental policy, verbal or written, which defendant violated.

The district court did not abuse its discretion in finding that defendant's actions demonstrated neither malfeasance or misfeasance. Therefore, the circuit court did not err in affirming the district court's refusal to bind over defendant on counts one through thirteen.

CONCLUSION

In Docket No. 186263, the case is remanded to the circuit court for further proceedings necessary to resolve counts two through six involving the common-law charge of misconduct in public office.

In Docket No. 190563, we affirm the circuit court's determination that the district court did not err in refusing to bind over defendant on counts one through thirteen involving the common-law charge of misconduct in public office. The remaining charges of misconduct in public office and destruction of public records have been addressed in this Court's previous decision. Therefore, we continue to affirm the circuit court's determination that the district court did not err in refusing to bind over defendant on counts fourteen and fifteen.

Affirmed in part and remanded in part. We do not retain jurisdiction.