PEOPLE v HARDRICK

Docket No. 238147. Submitted March 4, 2003, at Detroit. Decided August
26, 2003, at 9:15 A.M Leave to appeal sought.

Jose Hardrick was convicted following a bench trial in the Wayne Cir-
cuit Court, Brian R. Sullivan, J., of the common-law offense of mis-
conduct in office. The conviction was based on the use by the
defendant, a Detroit police officer, of an advance copy of the test
used for determining eligibility for promotion to the rank of ser-
geant to assist him in taking the examination. The defendant
appealed.

The Court of Appeals *held*:

Misconduct in office is corrupt behavior by an officer in the
exercise of the duties of his office or while acting under color of
his office. The defendant was on duty when he obtained the
advance copies of the examination and when he took the test with-
out disclosing that he had reviewed the advance copy. The trial
court correctly determined that the defendant acted with a corrupt
purpose. There is no merit to the defendant's challenge to the con-
stitutionality of MCL 750.505, which challenge was based on vague-
ness and lack of fair notice.

Affirmed.

*Michael A. Cox*, Attorney General, *Thomas L.
Casey*, Solicitor General, *Michael E. Duggan*, Pros-
ecuting Attorney, *Timothy A. Baughman*, Chief of
Research, Training, and Appeals, and *Jeffrey Camin-
sky*, Principal Attorney, Appeals, for the people.

*Bendure & Thomas* (by *Mark R. Bendure*) for the
defendant.

Before: HOEKSTRA, P.J., and SMOLENSKI and FORT
HOOD, JJ.

PER CURIAM. Defendant was convicted, following a bench trial, of the common-law offense of misconduct in office. MCL 750.505. He was sentenced to two years' probation. Defendant appeals as of right, and we affirm.

In January 1997, preparations began for the administration of promotional examinations for the ranks of investigator, sergeant, and lieutenant in the Detroit Police Department. A test developmental area was created. A steel door with a separate alarm system contained the area. Shredders were on site and individuals were precluded from taking any documentation from the area. The tests were prepared by twelve primary writers with the assistance of four attorneys to handle legal questions. An outside consultant was also retained to ensure fairness in the preparation and handling of the test materials. The security measures were designed to ensure that no candidate obtained an unfair advantage over any other candidate. The work product of each individual item writer was prepared on a laptop computer, but the information was stored on diskettes. The diskettes were protected by passwords and stored in a locked safe. Each writer was assigned a specific subject on the basis of their expertise, and the writers did not have access to the subjects being prepared by other writers. Prior examinations were not available for review as study materials or aids. Officers were encouraged to study the required material, and any sample questions were carefully controlled and uniform to ensure that all applicants were given equal opportunity.

All officers who signed up for the sergeant's examination were scheduled for duty that day and paid for a full eight-hour day to take the 200 question, multiple

choice examination. The participants had three hours to answer the questions on the examination. The examination was designed with the expectation that the top examinees would achieve a high score of 150 out of 200. There was a correlation between the top scorers on the promotional examination and the performance of those individuals in the police academy. The top scorers were, on average in the eighty-eighth percentile of their police academy class.

There were five phases in the promotional process of consideration for the rank of sergeant. The first phase involved taking the written examination, which accounted for sixty-five percent of the components necessary to achieve the rank of sergeant. Another component of the process of becoming a sergeant involved educational background, including college credits, and oral board examinations before executives from across the country. However, the police chief did have discretion to give charter promotions that were not contingent on the promotional examination.

In late March 1997, then Detroit Police Chief Isaiah McKinnon requested copies of the examinations for review. The chief was concerned about grammatical and typographical errors that had occurred on the 1994 examinations. Members of the committee in charge of preparation of the examination, including the outside consultant, were opposed to his viewing of the examination test questions. It was suggested that a protocol be established that would require the chief to sign a confidentiality agreement in the presence of the personnel director before review of the examinations. It was also suggested that the examinations be viewed and then returned to preclude them

from "laying around somewhere." A confidentiality agreement was prepared, but there was no indication that the document was ever signed or presented to the chief for his signature. Ultimately, test bank questions and "camera ready" examinations were submitted to the chief for his review. The material was clearly identified.

The examinations for all three promotional positions were administered on April 27, 1997, at Cobo Hall. The cost of preparation of the examinations alone, not including the payment of the officers' salaries for that day, was $250,000. Although the sergeant's examination was designed to provide a high score of approximately 150 correct answers of the 200 questions, two individuals obtained scores of 199, one individual scored 195, and defendant scored 191 on the sergeant's examination. It was concluded that the examination had been compromised, and the results were invalidated.

Defendant had been a security guard at the University of Detroit when he met McKinnon, an educator at the school. Defendant then attended the police academy and worked in the Detroit Police Department's Tenth Precinct for three months. When McKinnon became chief of police on January 1, 1994, defendant was assigned as Chief McKinnon's driver and part of his security staff. Consequently, defendant had access to the chief's office. Defendant applied to sit for the promotional examination for the rank of sergeant on April 27, 1997. Accordingly, defendant's duty assignment for April 27, 1997, was to take the promotional examination.

Defendant did not testify at trial, but did provide a statement to investigators from the Federal Bureau of

Investigation (FBI). When FBI agents interviewed defendant, they had already obtained fingerprint analysis identifying defendant's fingerprints on the lieutenant's examination question bank and the sergeant's written examination. Defendant volunteered that Chief McKinnon had stated that he would not give defendant a charter promotion, and defendant would have to earn a promotion on his own. Consequently, defendant asserted that he began studying for the sergeant's examination in November 1996, studying seven days a week, eight to nine hours each day. Defendant opined that he performed very well on the sergeant's examination and finished the examination fifteen to twenty minutes early.[1] Initially, defendant denied having access to advance copies of the examination. He later admitted that he may have inadvertently had a copy of the sergeant's examination. Defendant said he had asked the police chief for access to study materials while driving the chief to his residence. The chief responded that the study materials were on the sofa in his office. Defendant drove to the office and found a manila envelope on the sofa. Defendant examined the envelope when he arrived home. It appeared to contain test questions. Initially, defendant reported that he returned the material to the chief the next day. He later reported that he returned the material two days later. Defendant estimated that twenty-five percent of the questions on the sergeant's promotional examination were contained in the material found in the manila envelope. There was no title page or other identification or

---

[1] A coworker of defendant, also employed in the chief's office, testified that defendant left the examination before a thirty minute warning was called to signal the end of time for taking the examination.

label on the manila envelope to indicate that the material therein were test questions on the promotional examination.

The correlative factors normally present for success in the police academy and on the promotional examinations were not present in defendant's case. Defendant's high school grade point average was 1.68, and his college grade point average, based on courses taken, was 2.4. Defendant finished twenty-second out of thirty in his police academy class. The average participant in the promotional examinations improved his score with subsequent examinations. In 1998, the promotional examination was modified to 120 questions and tested the same topics. Consequently, a repeating participant increased his score by an average of nine points. Defendant's score did not improve. Rather, defendant failed the examination, answering only 49 out of 120 questions correctly. Thus, he would not have been eligible for a promotion, whereas his score on the 1997 examination would have ensured him the increase in rank.

Detroit police officers were governed by rules and regulations of conduct. It constituted neglect of duty for an officer to possess unauthorized materials, and an officer competing for a higher-ranking position was prohibited from participating in the development of the promotional examinations. An officer also had an obligation to report occurrences or suspicions that bear on a crime or attempted crime, and the possession of unauthorized materials was to be reported. Thus, even an inadvertent observation of the promotional examinations should have been reported. Following a bench trial, defendant was convicted of misconduct in office.

Defendant first contends that the acts for which he was prosecuted did not constitute misconduct in office because they did not arise from the performance of his official duties. Defendant claims that there was no showing that he obtained the advance copies of the examinations while he was on duty and that, although he was technically on duty when he sat for the examination, he was not required to take a promotional examination. Defendant also alleges that the trial court failed to sufficiently differentiate the concept of malfeasance from its finding that defendant acted with corrupt intent. The issue whether defendant was performing a public duty is a legal issue that is reviewed de novo. *People v Jenkins*, 244 Mich App 1, 14; 624 NW2d 457 (2000).

According to MCL 750.505, "[a]ny person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony . . . ." Defendant does not dispute that misconduct in office is a common-law offense. See *People v Thomas*, 438 Mich 448, 460-461; 475 NW2d 288 (1991) (BOYLE, J., concurring); Perkins & Boyce, Criminal Law (3d ed), p 543 ("Misconduct in office is corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office."); 4 Blackstone, Commentaries, p 153.

In *People v Carlin (On Remand)*, 239 Mich App 49, 64; 607 NW2d 733 (1999), this Court stated that

> the elements of the common-law offense of misconduct in office are (1) the person must be a public officer, (2) the conduct must be in the exercise of the duties of the office or done under the color of the office, (3) the acts were malfeasance or misfeasance, and (4) the acts must be corrupt

behavior. Perkins & Boyce, Criminal Law (3d ed), pp 540-545.

We agree with the trial court that a police officer is a public officer for purposes of evaluating a charge of misconduct in office. See *People v Coutu*, 459 Mich 348, 358; 589 NW2d 458 (1999). The testimony established that defendant utilized his position as a police officer assigned to the staff of the police chief to obtain advance copies of the promotional examination, he failed to immediately report to his superior that he possessed the advance copies, he used the test questions and correct answers to prepare for the examination, he failed to withdraw from the examination after having obtained the test questions in advance, and he sat for the examination and achieved a passing score without disclosing that he had an unfair advantage by obtaining the advance copies of the test questions and answers. Additionally, the testimony established that the testing site was defendant's official duty assignment for the day of the examination and his pay for that shift was based on his attendance at the test. We therefore conclude that defendant was on duty when he obtained the advance copies of the examinations and when he took the sergeant's promotional test without disclosing that he had reviewed the advance copies of the test.[2]

---

[2] Alternatively, we conclude that defendant was acting "under the color of the office." *Carlin, supra.* Actions by an officer that occur because he is an officer or because of the opportunity afforded by that fact arise under the color of the office. Perkins, Criminal Law (2d ed, 1969), ch 5, § 3D, p 483. Clearly, the opportunity to obtain the sergeant's examination arose from defendant's assignment as the driver and security officer for the police chief, which allowed him access to the office where the test was located.

Defendant next argues that the trial court incorrectly concluded that he committed an act of malfeasance with corrupt intent. The question of intent is properly resolved by the trier of fact, and we review a trial court's factual findings for clear error. *In re Forfeiture of $25,505*, 220 Mich App 572, 581; 560 NW2d 341 (1996). Intent may be inferred from all the facts and circumstances. *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999). We cannot conclude that the trial court's factual findings in this case were clearly erroneous. In *People v Coutu (On Remand)*, 235 Mich App 695, 706-707; 599 NW2d 556 (1999), quoting Perkins & Boyce, *supra*, at 543, this Court explained:

> The crimes for which defendants were charged require a showing of corrupt intent. Perkins & Boyce, *supra* at 541-542.
>
> "Corruption" in this context means a "sense of depravity, perversion or taint." *Id.* at 542. "Depravity" is defined as "the state of being depraved" and "depraved" is defined as "morally corrupt or perverted." *Random House Webster's College Dictionary* (1997). "Perversion" is "the act of perverting," and the term "perverted" includes in its definition "misguided; distorted; misinterpreted" and "turned from what is considered right or true." *Id.* The definition of "taint" includes "a trace of something bad or offensive." *Id.* Pursuant to the definitions, a corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of office by an officer. See also Perkins & Boyce, *supra* at 542 ("It is *corrupt* for an officer purposely to violate the duties of his office."). The corrupt intent needed to prove misconduct of office does not necessarily require an intent for one to profit for oneself. *Thomas, supra* at 461, n 6. [Emphasis supplied.]

Defendant violated the duties of his office because he had a continuing duty not to possess the test materials in advance of the examination, to immediately report to his superior that he had obtained an advance copy of the examination questions, to report anyone who provided unauthorized access to test materials, to avoid conduct unbecoming an officer—such as unauthorized possession of an advance copy of the examination—and to withdraw from the examination after having obtained advance review of the test questions. These actions, and failures to act, constituted acts of malfeasance and misfeasance that violated the duties of defendant's office. According to this Court's statement in *Coutu (On Remand), supra* at 706-707, quoting Perkins & Boyce, *supra,* at 542: " 'It is *corrupt* for an officer purposely to violate the duties of his office.' " The facts and circumstances do not support the allegation that defendant's possession was innocent, inadvertent, and that the advance copy was promptly returned. Rather, the score on the examination and the time frame in which it was completed indicate that the examination was reviewed and studied by defendant at the expense of all other applicants seeking promotions whose scores were invalidated. Therefore, the trial court correctly ruled that defendant acted with a corrupt purpose when he made deliberate and knowing use of the advance copy of the test to assist him in taking the sergeant's examination and thereby improperly obtain a promotion.

Defendant's challenge to the constitutionality of the statute based on vagueness is without merit. *People v Pickett,* 339 Mich 294, 309-311; 63 NW2d 681 (1954); *People v O'Neal,* 22 Mich App 432, 434-436; 177 NW2d

636 (1970). Additionally, his allegation that he, a police officer, was not on fair notice of the possibility of charges of misconduct in office because of the recent change in the law is without merit in light of *Thomas, supra.*

Affirmed.