# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

Reporter of Decisions:
Kathryn L. Loomis

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

PEOPLE v BRUCE
PEOPLE v NICHOLSON

Docket Nos. 156827 and 156828. Argued March 6, 2019 (Calendar No. 1). Decided July 25, 2019.

Terence M. Bruce and Stanley L. Nicholson were convicted following jury trials in the Jackson Circuit Court, Thomas D. Wilson, J., of common-law misconduct in office. Defendants were federal border patrol agents assigned to a Hometown Security Team (HST) task force that included Michigan State Police troopers, border patrol agents, and other officers operating in Jackson County. Defendants had been assigned to ensure perimeter security around a home during the execution of a search warrant and to help search the home and remove confiscated evidence. The task force kept a tabulation of items seized, but defendants took additional property not included on the tabulation. Defendant Nicholson took an antique thermometer and barometer device, insisting that it was junk, and he accidentally ruined the device when he took it home to clean it. Defendant Bruce took a wheeled stool with a leather seat home with him, but he returned it to the police department when asked about it. Defendants were charged with common-law misconduct in office as well as larceny in a building. Defendants moved for directed verdicts, arguing that they were not public officers for purposes of the misconduct-in-office offense. The court denied the motions, and the jury convicted defendants of misconduct in office but acquitted them of larceny in a building. Defendants appealed. In an unpublished per curiam opinion issued on October 5, 2017 (Docket Nos. 331232 and 331233), the Court of Appeals, SERVITTO, P.J., and MURRAY, J. (BORRELLO, J., dissenting), held that defendants were not public officers and vacated the convictions. The prosecution sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. 501 Mich 1026 (2018).

In an opinion by Justice CAVANAGH, joined by Justices MARKMAN, ZAHRA, and BERNSTEIN, the Supreme Court *held*:

Misconduct in office is corrupt behavior by an officer in the exercise of the duties of his or her office or while acting under color of his or her office. To determine whether a position constitutes a public office, a court considers five factors: (1) the position must be created by the Constitution or by the Legislature or created by a municipality or other body through authority conferred by the Legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the Legislature or through

legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they be those of an inferior or subordinate office, created or authorized by the Legislature, and by it placed under the general control of a superior officer or body; and (5) it must have some permanency and continuity, and not be only temporary or occasional. Oath and bond requirements are also of assistance in determining whether a defendant is a public officer. Together, these factors are referred to as the *Coutu* factors.[1] In this case, the central problem was how to categorize defendants for purposes of applying the factors—as border patrol agents or as federal agent HST members enforcing Michigan law. The relevant office to analyze must be determined by which duties defendants were exercising and the color of office under which defendants were acting. Defendants in this case were functioning as federal agent HST members enforcing Michigan law, and application of the *Coutu* factors showed that defendants, as federal agent members of the HST enforcing Michigan law, were public officers for purposes of the common-law offense of misconduct in office. The first factor was satisfied under MCL 764.15d, which provides that federal law enforcement officers may enforce state law to the same extent as a state or local officer when they are authorized under federal law with arrest powers and to carry a firearm and when they are participating in a joint investigation with a state or local law enforcement agency or acting pursuant to the request of local law enforcement. Defendants operated under the authority of MCL 764.15d in assisting with the execution of the warrant; therefore, the Legislature created defendants' positions. The second factor was satisfied because police officers discharging their duties act for the state in its sovereign capacity, so defendants possessed power delegated by the Legislature that was exercised for the benefit of the public. The third factor was satisfied because under MCL 764.15d, authorized officers may enforce state law to the same extent as a state or local officer and are granted the privileges and immunities of a peace officer of the state. MCL 764.15d also described the officers' duties to be discharged; in this case, the duties of defendants were the obligations of the HST and other duties authorized officers may have under MCL 764.15d. The fourth factor was satisfied because defendants were empowered to act only insofar as they were participating in a joint investigation or acting at the request of state officers; they were under the general control of the HST. The permanence requirement of the fifth factor was satisfied because the statutory delegation of the state's police power to qualifying federal agents used by defendants has been codified since 1999, the HST is an ongoing invocation of the delegated authority, and defendants were on long-term assignments. The additional factor of whether a defendant has taken an oath was not dispositive; that factor is merely used to assist with the determination. However, because federal law enforcement officers take oaths to defend the federal Constitution, MCL 764.15d(1) contemplates an oath as well. Although the parties disagreed about whether all the factors had to be established as elements, or only considered as factors, the disagreement did not need to be resolved because all the factors supported the conclusion that the defendants in this case were public officers. Accordingly, as federal agent HST members enforcing Michigan law, defendants were public officers for purposes of the offense of misconduct in office.

Reversed and remanded to the Court of Appeals.

Chief Justice MCCORMACK, dissenting, would have exercised restraint in defining the common-law crime because bedrock principles of fairness demand that a defendant have fair notice of criminal liability, because changing the scope of criminal liability is a role best left to the

---

[1] *People v Coutu*, 459 Mich 348 (1999).

Legislature, and because expanding the definition of "public officer" in this case causes future uncertainty instead of resolving it. There was no reason to expand this particular common-law crime to restrain conduct like the defendants' when other already-defined crimes exist and when defendants' conduct could have exposed them to civil liability, sanctions for violating federal ethics regulations, or adverse employment consequences. Accordingly, Chief Justice MCCORMACK would have held that the defendants in this case were not public officers for purposes of the common-law offense of misconduct in office. "Public office" is not defined as a mere grant of power; rather, it requires the give and take between authority and obligation—the officer holds the power of the state because the officer needs it to carry out his or her duties. In this case, defendants' duties derived from federal law. Under MCL 764.15d, federal agents receive, like a gift from the state, all the rights and immunities of Michigan peace officers, but they are not obligated to do anything in return. And a grant of power without undertaking a corresponding duty is merely a privilege. Because defendants had the privilege of enforcing state law but lacked the duty to do so, defendants did not hold "public office." Accordingly, Chief Justice MCCORMACK would have affirmed.

Justice VIVIANO, dissenting, would have held that the prosecution did not meet its burden of establishing that defendants were public officers for purposes of the offense of misconduct in office because *Coutu* elements 1, 3, 4, and 5 were not established and because defendants were not required to take an oath as HST members, which Justice VIVIANO would hold is also requisite to a finding that the position is a public office. Each of the *Coutu* elements must be established before a court may conclude that a position constitutes a public office for purposes of a misconduct in office charge. The first *Coutu* element was not met because there is no statute providing for the creation of HSTs, much less authorizing the Michigan State Police to appoint anyone to such a body. While the majority cited MCL 764.15d, that statute does not create a position on any particular task force or outline the duties of task force members, how they are appointed, or their tenure in office. The third element was not met because while the "powers conferred" on federal law enforcement officers working on joint investigations or task forces were defined by the Legislature in MCL 764.15d, the "duties to be discharged" were not defined in MCL 764.15d. The majority's analysis simply conflates statutory authority to perform certain tasks with a statutory duty to do so. MCL 764.15d was intended to allow federal law enforcement officers to enforce Michigan law to the same extent as a state or local officer, but only in limited circumstances and for limited purposes; MCL 764.15d does not purport to create a new office or to prescribe the duties of any such office. The fourth element was not met because MCL 764.15d does not provide for the appointment of members to a joint investigation or task force, create a command structure, or describe how any such joint investigation or task force will be administered. The fifth element was not met because MCL 764.15d does not create a permanent position on any particular task force or outline the duties of a task force member or how a member is appointed. Additionally, a task force is not, by its nature, a permanent or continuing entity; instead, it is organized and implemented to solve a specific problem. Finally, Supreme Court precedent has indicated that an oath is a necessary prerequisite to a finding that a person is a public officer for purposes of the charge of misconduct in office. Defendants were not required to take an oath, and MCL 764.15d, the statute that authorized them to enforce state law, makes no reference to an oath. Accordingly, Justice VIVIANO would have affirmed.

Justice CLEMENT, dissenting, would have held that defendants did not hold "public office" under the test articulated in *Coutu* because defendants' positions as federal agents and as members

of the task force were not created by the Constitution or by the Legislature or created by a municipality or other body through authority conferred by the Legislature. Accordingly, Justice CLEMENT would have affirmed.

©2019 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 25, 2019

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                  No. 156827

TERENCE MITCHELL BRUCE,

      Defendant-Appellee.

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                  No. 156828

STANLEY LYLE NICHOLSON,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

In these consolidated cases we consider whether defendants, who were federal border patrol agents operating as part of a joint task force enforcing Michigan law, are public officers for purposes of the common-law offense of misconduct in office. The crux of this question is how to categorize their offices—solely as border patrol agents or as federal agent task force members enforcing Michigan law. We hold that the categorization depends on the duties exercised by defendants and the color of office under which defendants acted. In these cases, because defendants exercised duties of enforcement of Michigan law and acted under authority granted to them by Michigan statute, they acted as public officers. Accordingly, we reverse the Court of Appeals and remand to that Court for consideration of defendants' remaining issues.

## I. FACTS AND PROCEDURAL HISTORY

Defendants, Terence Bruce and Stanley Nicholson, were federal border patrol agents assigned to a Hometown Security Team (HST) task force operating in Jackson County in December 2014. The HST is a "criminal intervention team" assigned mostly to freeways and that focuses on drugs and firearms. At the time, the HST consisted of Michigan State Police troopers, border patrol agents, and other officers.

Defendants were "embedded" with the HST, meaning that they did not have other duty assignments; they worked with the HST every shift. They took orders from superiors in the HST, and defendant Nicholson testified that he considered himself to have "peace officer status," that he adopted the authority of the HST, and that he participated in the law enforcement duties the HST performed. If the HST executed a search warrant, defendants took part.

2

On the evening of December 23, 2014, an HST patrol unit consisting of a Michigan State Police trooper and a border patrol agent executed a traffic stop against Benjamin Scott. The trooper searched Scott's car and found marijuana trimmings and proof of his residency. The investigation then incorporated another task force, the Jackson Narcotics Enforcement Team (JNET). HST and JNET obtained a search warrant for two residences Scott was renting and held a joint briefing to prepare to execute the warrant.

Defendants attended the briefing, which addressed team member assignments for the raid and contingencies such as where to retreat if shots were fired and which hospital to use if necessary. Defendants were assigned to ensure perimeter security during the initial entry and then to help search the homes and remove confiscated evidence. HST and JNET made entry and spent most of the evening and early morning disassembling and removing an elaborate marijuana-growing operation from the basements of the homes. The task forces seized grow lights, ballasts, netting, and marijuana plants. A careful tabulation was kept of every item taken that noted whether it was evidence of a crime or subject to forfeiture as proceeds of a crime. But defendants took additional property not included on the tabulation.

Defendant Nicholson took an antique thermometer and barometer device. He said that it was rusty and dirty, and he insisted that "it really was junk" when he removed it but that he intended to clean it up. According to defendant Nicholson, he took the device to his workshop where he tried to clean the lens with a rotary tool, but he accidentally burrowed through, making the device useless. After ruining the device, he discarded it and "gave it no other thought, it was trash." But it had not been trash to Scott. The device had

been given to Scott by his grandfather, who had received it from his father. It was a family heirloom.

Defendant Bruce took a wheeled stool with a leather seat home with him and kept it until he was asked about it by the HST team leader. When asked, Bruce admitted that he took the stool. He then returned it to the Michigan State Police post in Jackson.

Defendants were charged with common-law misconduct in office as well as larceny in a building. Each moved for pretrial dismissal and midtrial directed verdicts, arguing that they were not public officers for purposes of the misconduct-in-office offense. The trial court denied the motions for pretrial dismissal and midtrial directed verdicts in both cases. Ultimately the jury convicted defendants of misconduct in office but acquitted them of larceny in a building.

Defendants appealed and challenged their convictions on multiple grounds, including that they were not public officers for purposes of the misconduct-in-office offense. The Court of Appeals agreed that defendants were not public officers and vacated the convictions. *People v Bruce*, unpublished per curiam opinion of the Court of Appeals, issued October 5, 2017 (Docket Nos. 331232 and 331233). The prosecution sought leave to appeal in this Court, and we granted the application to address "whether the defendant federal border patrol agents were 'public officers' for purposes of the common-law crime of misconduct in office when they assisted—as members of a law enforcement task force that included Michigan State Police and Michigan motor carrier officers—in the execution of a search warrant." *People v Bruce*, 501 Mich 1026, 1026 (2018).

## II. STANDARD OF REVIEW

Whether defendants are public officers is a question of law that we review de novo. *People v Coutu*, 459 Mich 348, 353; 589 NW2d 458 (1999). Interpretation and application of statutes are also questions of law that we review de novo. *Id*.

## III. ANALYSIS

Often, appellate consideration of the common-law offense of misconduct in office has been a vertical inquiry into whether a defendant's status was more than that of an "employee," to the point of becoming a "public officer." Defendants argue that although they were executing a search warrant as HST team members, their status as border patrol agents makes this a horizontal problem that allows them to escape sideways from the common-law responsibilities at issue. We hold that the proper perspective of defendants' offices is determined by the duties they exercised and the color of office under which they acted. From that perspective, we see that defendants were public officers.

The idea that people who wield the power of the state are required to do so responsibly is not new. More than 20 years ago we observed that the common law describes the offense of misconduct in office as " 'corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office.' " *Coutu*, 459 Mich at 354, quoting Perkins & Boyce, Criminal Law (3d ed), p 543. Public officers had

been held accountable under the offense long before,[1] and public officers in Michigan have continued to be held accountable under the offense since.[2]

In *Coutu*, 459 Mich 348, we considered the question whether a deputy sheriff is a public officer. There, we built on the foundation of *People v Freedland*, 308 Mich 449; 14 NW2d 62 (1944), in constructing our understanding of who qualifies as an officer. *Freedland* had considered many authorities, including *State v Hawkins*, 79 Mont 506; 257 P 411, 418 (1927), which defined "public office of a civil nature" for purposes of Montana's constitutional prohibition on legislators holding multiple positions. The *Hawkins* court concluded that "five elements are indispensable" in any such office:

> (1) It must be created by the Constitution or by the Legislature or created by a municipality or other body through authority conferred by the Legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the Legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they be those of an inferior or subordinate office, created or authorized by the Legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity, and not be only temporary or occasional. [*Id*.]

---

[1] See, e.g., *State v Winne*, 12 NJ 152, 163; 96 A2d 63 (1953), citing 1 Burdick, The Law of Crime (1946), § 272, p 387 (recognizing common-law criminal misconduct-in-office offenses); *People v Ward*, 85 Cal 585, 586; 24 P 785 (1890) (recognizing the common-law offense of misconduct in office); *State v Wedge*, 24 Minn 150, 151 (1877) (recognizing common-law criminal offenses of misbehavior and malfeasance in office).

[2] See, e.g., *People v Milton*, 257 Mich App 467; 668 NW2d 387 (2003); *People v Hardrick*, 258 Mich App 238, 244; 671 NW2d 548 (2003).

*Freedland* quoted these five factors, among other considerations. *Freedland*, 308 Mich at 457-458. *Coutu* noted these same factors and also added that oath and bond requirements are "of assistance" in determining whether a defendant is a public officer. *Coutu*, 459 Mich at 355. The parties in this matter agree that *Coutu* identifies the relevant factors.[3]

---

[3] Although the parties agree as to the factors the test applies, they disagree as to the operation of the test. Defendants argue that each of the factors must necessarily be established, whereas the prosecution argues that the factors must only be considered. Justice VIVIANO agrees with defendants and would treat the factors as elements. Justice VIVIANO would also add an oath as an element. We do not need to resolve that disagreement in this case because all five factors support the conclusion that defendants are public officers and because defendants in fact took oaths.

It is noteworthy that we have never applied the factors in the way that defendants and Justice VIVIANO suggest. An "element" of a claim or crime is a "constituent part." See *Black's Law Dictionary* (9th ed). By definition, each "element" is necessary, and all "elements" together are sufficient. In *Freedland*, we quoted the factors from *Hawkins* and said that the "rule [was] accurately stated" there by the Montana Supreme Court. *Freedland*, 308 Mich at 457. But, as noted, *Hawkins* was one of many authorities we considered in *Freedland*. We also said "the correct rule is stated in Mechem on Public Offices and Officers" about a different rule, *Freedland*, 308 Mich at 455, and that *Scofield v Strain*, 142 Ohio St 290, 295; 51 NE2d 1012 (1943), stated "the rule expressed in the majority" of cases about yet a third rule, *Freedland*, 308 Mich at 457. We also observed in *Freedland* that in *People ex rel Throop v Langdon*, 40 Mich 673, 682 (1879), we had opined that an " 'officer is distinguished from the employee in the greater importance, dignity and independence of his position; in being required to take an official oath, and perhaps to give an official bond.' " *Freedland*, 308 Mich at 458. Rather than treating the factors from *Hawkins* as necessary individually and sufficient as a group, we resolved the question there by "[a]pplying the *rules* thus stated . . . ." *Id*. (emphasis added). They were factors in *Freedland*, not elements. Further, the question in *Freedland* was not even the definition of "public officer" for purposes of this common-law offense; rather, the question was whether the defendant was an "executive officer of the State of Michigan" for purposes of then Section 118 of the Penal Code. *Id*. at 452.

Then, in *Coutu*, we relied on *Freedland*'s discussion of *Hawkins* and *Langdon*. *Coutu*, 459 Mich at 354-357. We carried over the phrase "five indispensable elements," *id*. at 354, but that is not how the test was applied. If the five factors were "elements," each would have been necessary individually, and they would have been sufficient collectively.

The central problem of this case is how to categorize defendants for purposes of the *Coutu* analysis. Should we view defendants solely as border patrol agents or as federal agent HST members enforcing Michigan law? Again, defendants were charged with " 'corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office.' " *Id*. at 354, quoting Perkins & Boyce, p 543. The relevant office to analyze must be determined by which duties defendants were exercising and the color of office under which defendants were acting.

In some ways the categorization problem here is similar to that in *People v Perkins*, 468 Mich 448; 662 NW2d 727 (2003). In *Perkins*, the defendant was a deputy sheriff who was prosecuted for acts arising from his sexual relationship with a 16-year-old girl. *Id*. at 450. The charged offenses included misconduct in office. *Id*. at 449. By then we had already decided that a deputy sheriff was a public officer for purposes of the offense. *Id*. at 457, citing *Coutu*, 459 Mich at 357-358. But in *Perkins* we held that because there was "no evidence correlating that conduct with defendant's public office," there was no "nexus between defendant's alleged conduct and defendant's status as a sheriff's deputy." *Id*. at 457-458. Said another way, although the defendant was a public officer in another context, he was not acting under the color of that office when he allegedly committed the offense.

Defendants have not argued that they were off duty from the HST or at Scott's home solely as border patrol agents. Nor have defendants argued that they were enforcing a federal statute or acting under their power as border patrol agents. There is no dispute that

---

Accordingly, the oath consideration could not have had any effect. Again, we do not need to solve this puzzle in this case because all the factors are satisfied.

defendants were at Scott's home as federal agent HST members authorized to assist in the execution of the search warrant under MCL 764.15d. Under this section, under certain circumstances, federal law enforcement officers may "enforce state law to the same extent as a state or local officer," MCL 764.15d(1), and enjoy all the "privileges and immunities of a peace officer of this state," MCL 764.15d(2).[4] Defendants were functioning as federal

---

[4] In full, MCL 764.15d states:

(1) A federal law enforcement officer may enforce state law to the same extent as a state or local officer only if all of the following conditions are met:

(a) The officer is authorized under federal law to arrest a person, with or without a warrant, for a violation of a federal statute.

(b) The officer is authorized by federal law to carry a firearm in the performance of his or her duties.

(c) One or more of the following apply:

(*i*) The officer possesses a state warrant for the arrest of the person for the commission of a felony.

(*ii*) The officer has received positive information from an authoritative source, in writing or by telegraph, telephone, teletype, radio, computer, or other means, that another federal law enforcement officer or a peace officer possesses a state warrant for the arrest of the person for the commission of a felony.

(*iii*) The officer is participating in a joint investigation conducted by a federal agency and a state or local law enforcement agency.

(*iv*) The officer is acting pursuant to the request of a state or local law enforcement officer or agency.

(*v*) The officer is responding to an emergency.

9

agent HST members enforcing Michigan law, and that is the relevant perspective under

*Coutu*.  See *Bruce* (BORRELLO, J., dissenting), unpub op at 3.

Application of the *Coutu* factors shows that defendants, as federal agent members

of the HST enforcing Michigan law, are public officers for purposes of the common-law

offense of misconduct in office.[5]   The first factor is satisfied by MCL 764.15d.  As

described earlier, the Legislature provided for positions, such as those defendants held with

the HST, in which federal law enforcement officers "may enforce state law to the same

extent as a state or local officer . . . ."  MCL 764.15d(1).  Federal law enforcement officers

are vested with this authority if they are authorized under federal law with arrest powers

and to carry a firearm, MCL 764.15d(1)(a) and (b), and when they are participating in a

---

(2) Except as otherwise provided in subsection (3), a federal law enforcement officer who meets the requirements of subsection (1) has the privileges and immunities of a peace officer of this state.

(3) This section does not impose liability upon or require indemnification by the state or a local unit of government for an act performed by a federal law enforcement officer under this section.

(4) As used in this section:

(a) "Emergency" means a sudden or unexpected circumstance that requires immediate action to protect the health, safety, welfare, or property of an individual from actual or threatened harm or from an unlawful act.

(b) "Local unit of government" means a county, city, village, or township.

[5] While we agree with our dissenting colleagues that we should exercise restraint in defining common-law crimes, we disagree that our decision is an expansion of the common law rather than a consistent and restrained application of our precedent.

10

joint investigation with a state or local law enforcement agency or acting pursuant to the request of local law enforcement, MCL 764.15d(1)(c)(*iii*) and (*iv*). Defendants acknowledged at oral argument that they were operating under the authority of MCL 764.15d in assisting with the execution of the warrant. But for this statute, there would be no federal law enforcement officers who have authority to participate in these types of investigations. The Legislature created their positions, which authorized them to be in Scott's home.[6]

Analysis of the second factor is similar to that of *Coutu*'s analysis of deputy sheriffs because defendants were empowered to "enforce state law to the same extent as a state or local officer . . . ." MCL 764.15d(1). The second factor is satisfied because police officers

---

[6] Justice VIVIANO points out that MCL 764.15d "does not create a position on any particular task force or outline the duties of task force members, how they are appointed, or their tenure in office." However, Justice VIVIANO does not cite authority for why these considerations define what it means to "create a position." Adopting these considerations, and then applying them as Justice VIVIANO would, would be contrary to *Coutu*. It is true that MCL 764.15d does not create a position "on any particular task force," but neither does MCL 51.70 create a position of deputy in any particular sheriff's department, and that did not trouble us in *Coutu*. MCL 51.70 does describe the mechanism for creation of a particular position of a deputy sheriff by stating that "[e]ach sheriff may appoint 1 or more deputy sheriffs . . . ." But MCL 764.15d provides a similar mechanism by stating that the statute may be invoked when "[t]he officer is participating in a joint investigation conducted by a federal agency and a state or local law enforcement agency," MCL 764.15d(1)(c)(*iii*), or "[t]he officer is acting pursuant to the request of a state or local law enforcement officer or agency," MCL 764.15d(1)(c)(*iv*). The only tenure of office described by MCL 51.70 is appointment "at the sheriff's pleasure," which the sheriff "may revoke . . . at any time." Here, the relevant tenure is the length of participation in the relevant joint investigation, MCL 764.15d(1)(c)(*iii*), or at the pleasure of the requesting state or local law enforcement officer or agency, MCL 764.15d(1)(c)(*iv*). If MCL 764.15d does not create a position for purposes of this common-law offense, then neither does MCL 51.70. But we already held that it did in *Coutu*. We decline to revisit the method of application of this factor. More on duties below.

11

discharging their duties act for the state in its sovereign capacity, *Coutu*, 459 Mich at 355, citing *Tzatzken v Detroit*, 226 Mich 603, 608; 198 NW 214 (1924), so necessarily defendants, who were empowered to "enforce state law to the same extent as a state or local officer," MCL 764.15d(1), possessed power delegated by the Legislature that was exercised for the benefit of the public.

The third factor is also satisfied. Again, in *Coutu* we stated that " 'the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the legislature or through legislative authority[.]' " *Coutu*, 459 Mich at 354, quoting *Freedland*, 308 Mich at 458. Authorized officers "may enforce state law to the same extent as a state or local officer," MCL 764.15d(1), and they are granted the "privileges and immunities of a peace officer of this state," MCL 764.15d(2). That defendants were vested with broad "powers" is obvious enough. MCL 764.15d also directly or impliedly describes their "duties." A "duty" is commonly understood to be "something that one is expected or required to do by moral or legal obligation." *Random House Webster's College Dictionary* (2001). In *Coutu*, we held that this factor was satisfied because "the Legislature defined in part the powers and duties of deputy sheriffs," citing MCL 51.75, MCL 51.76(2), and MCL 51.221. *Coutu*, 459 Mich at 355. To the extent that those statutes impose obligations, they impose them on the sheriff and the department, but not on any particular deputy.[7]

---

[7] MCL 51.75 states that "[*t*]*he sheriff* shall have the charge and custody of the jails of his county, and of the prisoners in the same; and shall keep them himself, or by his deputy or jailer." (Emphasis added.) MCL 51.76(2) states:

> Each *sheriff's department* shall provide the following services within the county in which it is established and shall be the law enforcement agency

Additionally, MCL 51.221 states that a deputy "*may* serve or execute civil or criminal process issued by a court of this state, and have and exercise all the powers and duties of constables." (Emphasis added.) In *Coutu*, we held that a deputy's duties were the obligations of the sheriff, MCL 51.75, the obligations of the sheriff's department, MCL 51.76(2), and other duties a deputy *may* have, MCL 51.221. *Coutu*, 459 Mich at 355. We see little difference in this case, in which the duties of defendants were the obligations of the HST, MCL 764.15d(1)(c)(*iii*) and (*iv*), and other duties authorized officers may have, MCL 764.15d(1) ("A federal law enforcement officer may enforce state law to the same extent as a state or local officer . . . .").[8]

---

primarily responsible for providing the following services on county primary roads and county local roads within that county, except for those portions of the county primary roads and county local roads within the boundaries of a city or village; and on those portions of any other highway or road within the boundaries of a county park within that county:

    (a) Patrolling and monitoring traffic violations.

    (b) Enforcing the criminal laws of this state, violations of which are observed by or brought to the attention of the sheriff's department while providing the patrolling and monitoring required by this subsection.

    (c) Investigating accidents involving motor vehicles.

    (d) Providing emergency assistance to persons on or near a highway or road patrolled and monitored as required by this subsection. [Emphasis added.]

[8] Justice VIVIANO agrees that MCL 764.15d defines the powers conferred but argues that MCL 764.15d does not define the duties to be discharged. Our reading of Justice VIVIANO's dissent is that it considers duties not to be things that are "expected or required," but more like the sole statutory responsibilities of a sheriff. This is not necessarily an unreasonable way to think about *Coutu*'s third factor, but it is not how we have applied it before, and we decline to adopt this new approach. Moreover, the gravamen of defendants'

13

The fourth factor is also comparable to *Coutu*. There, we reasoned that although deputy sheriffs do not operate without a superior control other than the law, they are under the control of the sheriff, a "superior officer." *Coutu*, 459 Mich at 355. In this case, the situation is much the same. Defendants were operating under MCL 764.15d(1)(c)(*iii*) and (*iv*), so they were empowered to act only insofar as they were participating in a joint investigation or acting at the request of state officers. They were under the general control of the HST. Defendant Nicholson testified that border patrol agents embedded in the HST deferred to the knowledge and expertise of the Michigan State Police troopers, followed their lead, and took orders from them.[9]

---

misconduct was not in failing to perform a duty but in abusing the power they had unquestionably been granted by the state of Michigan. Neither any member of this Court nor defendants disagree that defendants possessed a delegation of a portion of the sovereign power of government that was to be exercised for the benefit of the public. Neither any member of this Court nor defendants disagree that defendants abused that power when they stole from Scott after entering his home without his permission under the color of their offices. It would strike us as odd to apply this offense in such a way as to punish a deputy sheriff serving on JNET or the HST for stealing from Scott, but not to punish defendants.

[9] Justice VIVIANO argues that MCL 764.15d "does not provide for the appointment of members to a joint investigation or task force, create a command structure, or describe how any such joint investigation or task force will be administered." First, we note that MCL 764.15d does provide for the appointment of members to a joint investigation. See MCL 764.15d(1)(c)(*iii*). Second, we do not read *Coutu* as requiring a detailed statutory "command structure." Indeed, the relevant statutes merely provide that deputy sheriffs serve at the pleasure of the sheriff. See MCL 51.70. In this case, defendants are limited by their participation in the joint investigation and/or the request of the Michigan State Police. MCL 764.15d(1)(c)(*iii*) and (*iv*). Just as deputy sheriffs serve at the pleasure of a sheriff, defendants served at the pleasure of the HST. We decline to revisit *Coutu*'s analysis or adopt any new understanding of this factor.

14

The permanence requirement of the fifth factor is satisfied from multiple perspectives. First, the statutory delegation of the state's police power to qualifying federal agents used by defendants has been codified since 1999. 1999 PA 64. There is nothing "temporary or occasional" about the delegation. We think that almost 20 years of delegated authority easily crosses the threshold of "some permanency and continuity." Second, the HST is an ongoing invocation of the delegated authority. The record does not reveal precisely when the HST was established, but the team leader, a Michigan State Police sergeant, had led the team continuously from December 2012 until this trial in September 2015. Therefore, we know that the team was in operation for nearly three years. Third, defendants were on long-term assignments, being "embedded" with the HST. Defendants did not have any other duty assignments. They worked with the HST every shift. Accordingly, there was permanency and continuity to defendants' assignment to the HST.[10]

_____

[10] Justice VIVIANO argues that MCL 764.15d "does not create a permanent position on any particular task force or outline the duties of a task force member or how a member is appointed." Justice VIVIANO is correct that MCL 764.15d does not create a permanent position on any *particular* task force. But again, neither does MCL 51.70 create a *particular* deputy sheriff position in any one department. As we declined to alter the method of analysis we applied to previous factors, we decline to do so for this factor as well. Justice VIVIANO also argues that being embedded in a task force is a situation that cannot have "some permanency and continuity" as the fifth factor requires because a task force is not permanent by definition. We respectfully disagree. Just because a task force may be formed to work on a specific problem does not mean that it cannot be permanent. "Permanent" is defined, in pertinent part, as "**1.** existing perpetually; everlasting. **2.** intended to serve, function, etc., for a long, indefinite period[.]" *Random House Webster's College Dictionary* (2001). A quick Internet search reveals the existence of many permanent task forces, including a permanent greenhouse gas sequestration task force, see State of Hawaii, Office of Planning, *Greenhouse Gas Sequestration Task Force* <https://planning.hawaii.gov/carbon-farming-task-force/> (accessed June 18, 2019) [https://perma.cc/F992-GT5D], a permanent environmental justice task force, see State of

Lastly, we note that whether a defendant has taken an oath is "of assistance" in this determination.[11]  *Coutu*, 459 Mich at 355.  The delegation of the state's police power used by these defendants, MCL 764.15d, is not available to everyone.  Rather, the delegation may only be used by a "federal law enforcement officer."  MCL 764.15d(1).  Because federal law enforcement officers take oaths to defend the federal Constitution, MCL 764.15d(1) contemplates an oath as well.  At any rate, this factor is not dispositive.  Under *Coutu*, defendants are public officers.

The Court of Appeals majority concluded that the relevant perspective was that defendants were mere border patrol agents and then observed that the authority that allowed defendants to enforce Michigan law had no bearing on the authority that created the border patrol.  *Bruce*, unpub op at 4.  This same argument is offered by defendants, who assert that the position of federal border patrol agent was created by Congress, not the Michigan Constitution or Michigan Legislature.  For further support, defendants point out that MCL 15.181(e) defines "public officer" in a way that does not allow for creation of such a

_____

California, California Environmental Protection Agency, *Environmental Justice Task Force* <https://calepa.ca.gov/enforcement/environmental-justice-compliance-and-enforcement-task-force/> (accessed June 18, 2019) [https://perma.cc/2M8F-92NH], and several permanent task forces to address election security, see Lawler, *FBI, DHS Task Forces To Address Election Security Are Now Permanent*, Engadget (April 26, 2019), available at <https://www.engadget.com/2019/04/26/christopher-wray-election-task-force-fbi> (accessed June 18, 2019), just to name a few.  As noted, the HST had been in existence and under the same leadership for more than three years.  Defendants were embedded within the HST. Neither the HST nor defendants' embedding within it were "temporary" or "occasional," but rather satisfied the requirement of "some permanency and continuity."

[11] Again, as we otherwise declined to alter the *Coutu* analysis, we decline to convert the oath consideration into an element.

16

public office by Congress. These arguments all err in that they focus on defendants' status as mere border patrol agents rather than on their status as federal agent HST members enforcing Michigan law.[12] If defendants had been operating only as federal border patrol agents, the body which created that position would be relevant. But it was *because* they were federal agent HST members and *because* they were enforcing Michigan law that they were in Scott's home. That makes their authority to enforce Michigan law—and their status as federal agent HST members—the relevant perspective.

Defendants also argue that they were not "law enforcement officer[s]" as defined by MCL 28.602(*l*).[13] Whether defendants were state law enforcement officers as defined by MCL 28.602(*l*) has no relevance as to whether they were federal law enforcement officers for purposes of MCL 764.15d.[14] Defendants conceded during oral argument that they were federal law enforcement officers and that they were acting under the authority of MCL 764.15d.

---

[12] Additionally, MCL 15.181 is simply not applicable to the common-law offense of misconduct in office. MCL 15.181 provides a list of statutory definitions that is introduced by the phrase, "[a]s used in this act[.]" This introduction indicates that the "Legislature has chosen to specifically limit the applicability of a statutory definition . . . ." *People v Feeley*, 499 Mich 429, 444; 885 NW2d 223 (2016). The term "public officer" has its own common-law meaning in the context of the offense of misconduct in office, and we use that meaning until it has been modified by the Legislature. *Perkins*, 468 Mich at 455. As discussed earlier, *Coutu* defines what it means to be a "public officer" for purposes of the common-law offense of misconduct in office, not MCL 15.181.

[13] In 2016, the Legislature rewrote MCL 28.602; "law enforcement officer" is now defined in MCL 28.602(f). See 2016 PA 289.

[14] Again, this statutory definition is simply inapplicable. The definitions provided in MCL 28.602 are for use "in this act," referring to the Michigan Commission on Law Enforcement Standards Act, MCL 28.601 *et seq*. See *Feeley*, 499 Mich at 444.

Finally, defendants argue that MCL 764.15d only governs when federal law enforcement officers can make an arrest for violation of a Michigan state law offense, rather than being a general grant of police powers. The plain language of MCL 764.15d reveals that its scope is significantly broader than defendants suggest. The statute gives federal law enforcement officers the power to "enforce state law to the same extent as a state or local officer," MCL 764.15d(1), and states that federal law enforcement officers enjoy all the "privileges and immunities of a peace officer of this state," MCL 764.15d(2), under certain circumstances. Moreover, we look to the language of the statute to ascertain its meaning; while statutory titles and headings are "useful navigational aids," they "should never be allowed to override the plain words of a text." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 221-222. See *People v Jaboro*, 76 Mich App 8, 11; 258 NW2d 60 (1977) (" 'The title cannot control the plain words of the statute.' "), quoting 2A Sutherland, Statutory Construction (4th ed), § 47.03, pp 72-73.[15] This same principle regarding statutory titles and headings can be applied to the chapter titles within the statute. Accordingly, while MCL 764.15d is codified within Chapter IV of the Code of Criminal Procedure, which is entitled "Arrest," we look to the language of the statute for its meaning rather than the title of the chapter. At any rate, the relevant analysis is whether defendants satisfied *Coutu* through their invocation of MCL 764.15d. As discussed earlier, they did.

---

[15] If the body of a statute is ambiguous, a court may look to the title to resolve the ambiguity, *Kalee v Dewey Prod Co*, 296 Mich 540, 545; 296 NW 826 (1941), but when the meaning of a statute is otherwise clear, the title may not be used to create ambiguity, *Jaboro*, 76 Mich App at 11.

## IV.  CONCLUSION

We conclude that defendants are public officers, as federal agent HST members enforcing Michigan law, for purposes of the offense of misconduct in office.  Accordingly, we reverse the decision of the Court of Appeals and remand to that Court for consideration of defendants' remaining arguments.

Megan K. Cavanagh
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein

19

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellant,

v             No. 156827

TERENCE MITCHELL BRUCE,

   Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellant,

v             No. 156828

STANLEY LYLE NICHOLSON,

   Defendant-Appellee.

_____

MCCORMACK, C.J. (*dissenting*).

I respectfully dissent. I share Justice VIVIANO's concerns about the need for restraint in defining common-law crime. Not just because bedrock principles of fairness demand that a defendant have fair notice of criminal liability, but because changing the scope of criminal liability is a role best left to the Legislature and, perhaps most importantly, because expanding the definition of "public officer" causes future uncertainty rather than resolving it.

I'm not concerned that these defendants suffered unfair surprise. An ordinary, law-abiding citizen in the defendants' position would have known that taking something that doesn't belong to him might be a crime. But I see no reason for us to expand this particular common-law crime to restrain conduct like the defendants' when other already-defined crimes (or noncriminal consequences) will do the job. For example, the defendants *were* charged with (but acquitted of) larceny in a building. And their conduct could have exposed them to civil liability, sanctions for violating federal ethics regulations,[1] or adverse employment consequences. Although it feels perfectly intuitive to extend the definition of a public officer under the specific facts of *this* case, that seemingly intuitive principle may have downstream consequences—an overinclusive, indefinite rule "broadcasts to the law-enforcement community a potent message: the limits of official coercion are not fixed; the suggestion box is always open. The result is that lawmaking devolves to law enforcement, and police and prosecutors are invited to play too large a role in deciding what to punish." Jeffries, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 Va L Rev 189, 223 (1985). These concerns are only heightened when criminal liability stems from a common-law crime rather than a statute.

We can largely avoid these hazards by applying settled law to facts. And I would conclude that under our caselaw, the defendants were not public officers for purposes of the common-law offense of misconduct in office. To convict a defendant of common-law misconduct in office, the prosecution must establish that the defendant (1) is a public

---

[1] See, e.g., US Customs and Border Protection Directive, *Standards of Conduct*, No. 51735-013A (March 13, 2012).

officer (2) who engaged in corrupt behavior (3) in the exercise of the duties of his office or while acting under color of his office. *People v Coutu*, 459 Mich 348, 354; 589 NW2d 458 (1999). At common law, misconduct could entail malfeasance, misfeasance, or nonfeasance. *People v Perkins*, 468 Mich 448, 456; 662 NW2d 727 (2003). But nonfeasance has been codified as a misdemeanor. See MCL 750.478 ("When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every willful neglect to perform such duty, where no special provision shall have been made for the punishment of such delinquency, constitutes a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00."). And MCL 750.505 provides a catchall provision for "any indictable offense at the common law, for the punishment of which *no provision is expressly made by any statute* of this state . . . ." (Emphasis added.) Thus, only theories of misfeasance and malfeasance remain as common-law crimes. Misconduct under these theories (in contrast to nonfeasance) is also the most susceptible to existing criminal and noncriminal consequences.

It is only the first element that causes disagreement—whether the defendant border patrol agents were public officers. The question isn't whether they are public officers in the abstract or public officers under federal law, but whether they are public officers for this court-defined Michigan crime. And the parties agree that *Coutu*, 459 Mich at 354, states the relevant test for distinguishing between public officers and mere employees. The prosecution's theory is that the defendant border patrol agents hold "public office" because the Legislature, in effect, deputized certain federal law enforcement officers by authorizing them to enforce the laws of the state and vesting them with the privileges and immunities

3

enjoyed by Michigan peace officers. MCL 764.15d. This theory is appealing—Michigan entrusted these border patrol agents with a sliver of the sovereign power of government, and they abused the public trust by using their privilege to commit misconduct.

But we have not defined "public office" as a mere grant of power. Rather, it requires the give and take between authority and obligation—the officer holds the power of the state *because* she needs it to carry out her duties. Under MCL 764.15d, federal agents receive, like a gift from the state, all the rights and immunities of Michigan peace officers, but they are not obligated to do anything in return. And a grant of power without undertaking a corresponding duty is merely a privilege. This distinguishes the position created by MCL 764.15d from the position of deputy sheriff in *Coutu*. There, the Legislature specifically authorized the sheriff to appoint deputies. MCL 51.70 ("Each sheriff may appoint 1 or more deputy sheriffs at the sheriff's pleasure, and may revoke those appointments at any time."). And it enacted *other* statutes specifically defining the duties of the sheriff or sheriff's department. E.g., MCL 51.75 and 51.76; MCL 51.221. Without a similar statute that "define[s], directly or impliedly," some set of "duties to be discharged" under MCL 764.15d, I conclude that the third element of the *Coutu* test is not met.

The parties dispute whether the test described in *Coutu* was an all-or-nothing set of elements or a flexible totality-of-the-circumstances standard. But I would end the analysis here under either standard. Even under the more flexible approach, I find that the lack of affirmative duty conveyed by law is fatal. And without a duty, several other elements fail in cascade.

In sum, the border patrol agents here had the privilege of enforcing state law but no duty to do so. Their duties derived from federal law. And their relationship with Michigan

4

law enforcement was one of mutual agreement, not law.  Thus, I cannot conclude that they held "public office" as *Coutu* used that term.  And because I conclude that the lack of duty is fatal, I would affirm.

Bridget M. McCormack

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v                                    No. 156827

TERENCE MITCHELL BRUCE,

        Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v                                    No. 156828

STANLEY LYLE NICHOLSON,

        Defendant-Appellee.

_____

VIVIANO, J. (*dissenting*).

Just last term, in a unanimous opinion, our Court reaffirmed our longstanding rule that " '[a] criminal statute ought to be so plain and unambiguous that "he who runs" may read, and understand whether his conduct is in violation of its provisions.' " *People v Pinkney*, 501 Mich 259, 268; 912 NW2d 535 (2018), quoting *People v Ellis*, 204 Mich 157, 161; 169 NW 930 (1918). Because the majority's rendering of the parameters of the common-law offense of misconduct in office does not live up to that standard, I respectfully dissent.

Defendants were charged under MCL 750.505, which pertains generally to common-law criminal offenses but does not purport to define any specific crime. Instead, the statute provides that "[a]ny person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of felony . . . ." MCL 750.505. Here, defendants were charged with the common-law offense of misconduct in office. "When the Legislature codifies a common-law crime without articulating its elements, we must look to the common law for the definition of the crime. We are bound by the common-law definition until the Legislature modifies it." *People v Perkins*, 468 Mich 448, 455; 662 NW2d 727 (2003) (citation omitted).

We have previously observed that "[a]t common law, misconduct in office constituted 'corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office.' " *People v Coutu*, 459 Mich 348, 354; 589 NW2d 458 (1999), quoting Perkins & Boyce, Criminal Law (3d ed), p 543. The element of this offense at issue here is whether defendants are public officers. See *Perkins*, 468 Mich at 457 ("To be guilty of misconduct in office, one must first be a public officer.").

In *Coutu*, we held that five elements are indispensable to a determination of whether a position constituted a public office for purposes of a misconduct in office charge:

> "(1) It must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power other than the law, unless they be those of an inferior or subordinate office,

2

created or authorized by the legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity, and not be only temporary or occasional." [*Coutu*, 459 Mich at 354, quoting *People v Freedland*, 308 Mich 449, 457-458; 14 NW2d 62 (1944).]

To these five, I believe a sixth should be added: the officer must be required to take an official oath. To understand why, and before determining whether these elements were satisfied in this case, it is necessary to briefly trace the origins of the *Coutu* elements.

A.  HISTORY OF THE *COUTU* ELEMENTS

First a general observation: the *Coutu* elements were not originally designed to answer the question of whether a position constitutes a public office for purposes of a misconduct in office charge. Instead, they were derived from cases involving dual office prohibitions or more specific statutory misconduct crimes. The *Coutu* elements were first annunciated by the Montana Supreme Court in *State v Hawkins*, 79 Mont 506; 257 P 411 (1927), which addressed whether the position of auditor of the board of railroad commissioners was a public office, such that a state representative would be barred by the state constitution from concurrently serving in both positions. The court began by observing that "[t]here are a great many judicial decisions defining the word 'office' or the words 'public office.' The subject is an old one, and decisions extend far back." *Id*. at 413. After reviewing a number of those decisions, the court summarized them as follows:

> From the foregoing and many other authorities examined it appears that various elements are considered requisite to a public office. Some decisions hold that the taking of an official oath is necessary to constitute a position an office; others hold that the giving of an official bond is necessary; still others hold that the issuance of a commission or certificate of appointment is necessary; some decisions hold all three requisite. . . .

3

Some decisions hold that, in an office, there must be tenure, duration, a definite term of service; others that the character of the service does much to determine if a position is an office. . . .

Practically all of the authorities, however, hold that to an officer are granted some of the sovereign powers of the government, to be exercised for the benefit of the public. They hold, also, quite generally that an officer's duties must be prescribed by law, and that he must be independent in the exercise of them, and not subject to orders from a superior as to the nature or discharge of his duties, with the exception of some assistants, such as Assistant Attorneys General, secretaries, and the like, created by law, with salaries fixed by law. Some authorities hold deputies to be officers; others not. Those two rules, stated above, delegation of sovereign power and independent exercise of it, with the stated exception in the latter, appear to be general. [*Id*. at 414.]

After reviewing another batch of cases that it believed were in accord, the court quoted the following passage from *People ex rel Throop v Langdon*, 40 Mich 673, 682-685 (1879), an opinion written by our esteemed predecessor, Justice THOMAS COOLEY:

"The officer is distinguished from the employee in the greater importance, dignity and independence of his position; in being required to take an official oath, and perhaps to give an official bond; in the liability to be called to account as a public offender for misfeasance or nonfeasance in office, and usually, though not necessarily, in the tenure of his position. * * * In this case the facts are stipulated. * * * We find among them no evidence that an office known as chief clerk in the office of the assessor * * * has been created. A person has been appointed, and has acted under the designation of chief clerk, but no statute or ordinance has given him that title, and if he were now to be called and to style himself in the discharge of his duties head clerk, or leading clerk, or assistant to the assessor, or assessor's amanuensis, it would, for aught we can discover, be equally well, for nothing whatever depends upon the name. * * * Nor do we find in the facts stipulated or in any law or ordinance the requirement of an official oath. It is said that the usual oath of office has sometimes and perhaps always been administered, but why administered we do not understand. The fact of its being taken cannot prove that the clerk is an officer. * * * It was, we think, a needless ceremony. Nor do the duties usually performed by the chief clerk indicate an office rather [than] an employment. Nothing but custom has defined them. * * * He is still wholly subordinate to the assessor, having no independent functions. * * * The duties, such as they are, can be

4

changed at the will of the superior, since no rule of law or well defined custom forbids it." [*Hawkins*, 257 P at 415.][1]

At the conclusion of its "exhaustive examination of the authorities," the *Hawkins* court held that

> five elements are indispensable in any position of public employment, in order to make it a public office of a civil nature: (1) It must be created by the Constitution or by the Legislature or created by a municipality or other body through authority conferred by the Legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the Legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they be those of an inferior or subordinate office, created or authorized by the Legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity, and not be only temporary or occasional. [*Id.* at 418.]

The court also held that, "[i]n addition, in this state, an officer must take and file an official oath, hold a commission or other written authority, and give an official bond, if the latter be required by proper authority." *Id.* After reciting these elements, the court had little difficulty in determining that the position of auditor was not a civil office under the state because it "[did] not possess a delegation of a portion of the sovereign power of government"; instead, the auditor was "only an employee; holding a position of employment, terminable at the pleasure of the employing power . . . ." *Id.*

Our Court first made reference to the *Coutu* elements in *Freedland*, where we addressed the question of whether the defendant, " 'an accounts examiner of the Michigan

---

[1] In *Langdon*, the Court had little difficulty concluding that the so-called chief clerk in the city assessor's office was only an employee, not an officer for purposes of a quo warranto action.

5

State sales tax division,' " was an "executive officer" for purposes of a statute making it a crime for an executive, legislative, or judicial officer to accept a bribe. *Freedland*, 308 Mich at 452. The defendant argued that he was not a public officer for the following reasons:

> (a) He did not fill any position that was established or created by statute or other legislation;
>
> (b) There were no duties conferred upon his position by law;
>
> (c) He was hired to perform his work and did not fill an appointive position;
>
> (d) His position was completely lacking in the independence and dignity associated with a public officer;
>
> (e) His position was completely lacking in discretionary powers which usually are inherent in a public office;
>
> (f) He took no oath of office;
>
> (g) He had no fixed tenure of office.
>
> Defendant had no right to hire or discharge employees, nor the right to impose, or cancel, the taxes provided for by law. [*Id*. at 454.]

After citing numerous authorities, the Court observed that "[t]he rule is accurately stated in [*Hawkins*]" and then quoted the passage cited above containing the five indispensable elements. *Id*. at 457-458. Interestingly, the Court did not discuss the defendant's arguments or the elements individually in reaching its conclusion that the defendant was not a public officer under the statute. Instead, the Court simply observed that the "defendant neither had the dignity nor the discretion usually vested in one holding a public office." *Id*. at 458. Then, the Court analyzed the statute in context and determined that

since the defendant was not a public officer, he should have been charged under a different section of the Michigan Penal Code, MCL 750.1 *et seq*. *Id*. at 458-460.

Finally, as noted above, two decades ago in *Coutu*, our Court adopted the five indispensable elements from *Hawkins* and used them for the first time to determine whether a person is a public officer for purposes of a common-law misconduct in office charge. It is to the *Coutu* Court's findings regarding those elements—and how its analysis differs from the majority's in this case—that I now turn.

## B. THE *COUTU* ELEMENTS ARE NOT SATISFIED IN THIS CASE

A review of the *Coutu* Court's treatment of the five indispensable elements, and a comparison of the majority's treatment of them here, shows where the majority's analysis misses the mark.

### 1. TO CONSTITUTE A PUBLIC OFFICE, THE POSITION MUST BE CREATED BY THE CONSTITUTION OR BY THE LEGISLATURE OR CREATED BY A MUNICIPALITY OR OTHER BODY THROUGH AUTHORITY CONFERRED BY THE LEGISLATURE

It is undisputed that defendants' positions as agents of the United States Border Patrol were not created by Michigan's Constitution or by the laws of this state. However, at all times relevant to this case, defendants were assigned to a Hometown Security Team (HST), a task force comprised of members of the Michigan State Police (MSP), motor carrier officers, and federal Border Patrol agents. *People v Bruce*, unpublished per curiam opinion of the Court of Appeals, issued October 5, 2017 (Docket Nos. 331232 and 331233), p 2. No one contends that positions on the HST—or positions on joint state and federal law enforcement task forces more generally—are created by the Michigan Constitution or by the MSP through authority conferred by the Legislature. So, I agree with the majority

7

to the extent it believes that the appropriate question as it relates to the first *Coutu* element is whether defendants' positions as HST members were "created by . . . the legislature."[2]

In *Coutu*, the analysis of this element was straightforward: the Court simply noted that "the Legislature provided for the creation of deputy sheriffs at MCL 51.70," which provides that "[e]ach sheriff may appoint 1 or more deputy sheriffs at the sheriff's pleasure, and may revoke those appointments at any time." *Coutu*, 459 Mich at 355. Here, however, there is no statute providing for the creation of HSTs, much less authorizing the MSP to

---

[2] The majority's reference to *Coutu*'s five indispensable elements as "factors" is misleading. They are not simply factors to be considered in some sort of balancing test, but instead "five indispensable elements" that must be established before a court may conclude that a position is a public office. See *Coutu*, 459 Mich at 354. See also *Hawkins*, 257 P at 418 ("[W]e hold that five elements are indispensable to any position of public employment, in order to make it a public office of a civil nature[.]"). In case there could be any doubt, perusal of a dictionary confirms that "indispensable" means either "absolutely necessary, essential, or requisite" or "incapable of being disregarded or neglected[.]" Dictionary.com <https://www.dictionary.com/browse/indispensable?s=ts> (accessed June 28, 2019) [https://perma.cc/4WWZ-8L63]. And "element" in ordinary usage means "a component or constituent of a whole or one of the parts into which a whole may be resolved by analysis[.]" Dictionary.com <https://www.dictionary.com/browse/element?s=t> (accessed June 28, 2019) [https://perma.cc/W9JX-BJY2]. Thus, each element is absolutely necessary to a finding of a public office. By adopting such a stringent test, our Court implicitly rejected the totality of the circumstances approach now favored by the majority. In addition to running headlong into our caselaw, the majority's approach provides significantly less clarity about the scope of this common-law offense and, as a result in my view, gives rise to the same constitutional concerns as a vague statutory offense. See *United States v Davis*, 588 US ___, ___; ___ S Ct ___; ___ L Ed 2d ___ (2019) (Docket No. 18-431); slip op at 1 (explaining that vague laws violate due process and the separation of powers because "[t]hey hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct").

appoint anyone to such a body.[3]  Notwithstanding, the majority believes that "the Legislature provided for positions, such as those defendants held with the HST" pursuant to MCL 764.15d.  That statute authorizes federal law enforcement officers to "enforce state law to the same extent as a state or local officer," MCL 764.15d(1), and grants them "the privileges and immunities of a peace officer of this state" under certain specified conditions, MCL 764.15d(2).[4]  But it does not create a position on any particular task force

---

[3] Notably, the description of HSTs in the Michigan State Police *Services Guide* does not even refer to federal law enforcement officers:

> Each Hometown Security Team consists of one sergeant, four troopers, and one motor carrier officer.  They concentrate on highway crime and enhanced traffic enforcement by augmenting local police services with visible patrols.  Their goal is to saturate areas with enhanced police presence in an effort to reduce crime and improve public safety by reducing serious traffic accidents.  Each Hometown Security Team also has the ability to rapidly assist local communities in times of crisis.  [Michigan State Police, *Services Guide* (March 28, 2014), p 4, available at <https://www.michigan.gov/documents/msp/ServicesGuide_455043_7.pdf> (accessed June 13, 2019) [https://perma.cc/AP8J-WJM2].]

[4] MCL 764.15d(1) provides, in pertinent part, as follows:

> (1) A federal law enforcement officer may enforce state law to the same extent as a state or local officer only if all of the following conditions are met:

> (a) The officer is authorized under federal law to arrest a person, with or without a warrant, for a violation of a federal statute.

> (b) The officer is authorized by federal law to carry a firearm in the performance of his or her duties.

> (c) One or more of the following apply:

> * * *

9

or outline the duties of task force members, how they are appointed, or their tenure in office. Instead, the statute simply authorizes federal law enforcement officers to work in a different capacity (enforcing state, rather than federal, law) in limited circumstances (if the officer has arrest power and is authorized to carry a firearm in the performance of his or her duties under federal law) and for a limited purpose (as relevant here, to serve on a joint state and federal investigation or otherwise at the request of a state or local law enforcement agency).

The majority bases its finding that the first element is met on thin gruel—how thin will become apparent when MCL 764.15d is examined in relation to the third, fourth, and fifth *Coutu* elements. Suffice it to say that I do not believe this first element is satisfied by the statute.[5]

> 2. TO CONSTITUTE A PUBLIC OFFICE, THE POSITION MUST POSSESS A DELEGATION OF A PORTION OF THE SOVEREIGN POWER OF GOVERNMENT, TO BE EXERCISED FOR THE BENEFIT OF THE PUBLIC

As to the second element, I agree with the majority that, pursuant to MCL 764.15d(1), defendants in this case "possess a delegation of a portion of the sovereign power of government . . . ." There can be no serious debate that defendants, when acting

---

> (*iii*) The officer is participating in a joint investigation conducted by a federal agency and a state or local law enforcement agency.

> (*iv*) The officer is acting pursuant to the request of a state or local law enforcement officer or agency.

[5] Ordinarily, this finding would be the end of the matter. But since the majority analyzes all the *Coutu* elements and believes that they all "support the conclusion that defendants are public officers," I will address them as well.

pursuant to the limited authority granted by MCL 764.15d(1), "exercise sovereign power while engaged in the discretionary discharge of their duties." *Coutu*, 459 Mich at 355, citing *Tzatzken v Detroit*, 226 Mich 603, 608; 198 NW 214 (1924).

> 3. TO CONSTITUTE A PUBLIC OFFICE, THE POWERS CONFERRED, AND THE DUTIES TO BE DISCHARGED, MUST BE DEFINED, DIRECTLY OR IMPLIEDLY, BY THE LEGISLATURE OR THROUGH LEGISLATIVE AUTHORITY

Regarding the third element, I agree with the majority that "the powers conferred" on federal law enforcement officers working on joint investigations or task forces were defined by the Legislature in MCL 764.15d. But it is equally clear that the "duties to be discharged" are nowhere to be found in the statute. This is a critical point.

In *Langdon*, we explained that "[a]n office is a special trust or charge created by competent authority. *If not merely honorary, certain duties will be connected with it*, the performance of which will be the consideration for its being conferred upon a particular individual, who for the time will be the officer." *Langdon*, 40 Mich at 682 (emphasis added). The Court first observed that "[n]othing but custom" had defined the duties usually performed by the chief clerk and that "custom ha[d] certainly not been very specific . . . ." *Id*. at 685. Next, the Court observed that "the duties, such as they are, can be changed at the will of the superior, since no rule of law or well defined custom forbids it." *Id*. Finally, the Court observed that it was unaware of any "case in which [chief clerk] is conferred as a title of office where the duties are undefined." *Id*. at 686.

This requirement of a duty is consistent across many jurisdictions. See *Hawkins*, 257 P at 414 (noting many authorities holding "that an officer's duties must be prescribed by law"). See also *Farley v Perry Bd of Ed*, 62 Okla 181; 162 P 797, 799 (1917) ("The

11

duties of an officer are fixed by law," and "in the discharge of his duties he knows no guide but the established law . . . ."); *State v Begyn*, 34 NJ 35, 42; 167 A2d 161 (1961) ("The relevant duties actually assigned and undertaken are controlling in this type of situation and not the mere matter of designation of a title."); *State v Sellers*, 7 Rich 368, 371; 41 SCL 368 (1854) (" 'Every man is a public officer who hath any duty concerning the public; and he is not the less a public officer where his authority is confined to narrow limits; because it is the duty of his office, and the nature of that duty, which makes him a public officer, and not the extent of his authority.' "); *State v Hess*, 279 SC 14, 20; 301 SE2d 547 (1983) ("The existence of a duty owed to the public is essential, for otherwise the offending behavior becomes merely the private misconduct of one who happens to be an official."); *Raduszewski v New Castle Co Superior Court*, 232 A2d 95, 96 (Del, 1967) (explaining that to be a public officer a person must, among other things, have "the authority *and duty* to exercise some part of the sovereign power of the State" and holding that an inspector in the motor vehicle department was not a public officer because, among other things, "the duties and authority of an inspector" were not prescribed by statute) (emphasis added); *Hawkins*, 257 P at 418 (noting that another Montana case, *State v Edwards*, 38 Mont 250; 99 P 940 (1909), "held that a policeman is a 'public officer,' in the sense that, by provision of municipal ordinances, as well as of statute, he has to perform certain prescribed, definite duties to the public").

The duty requirement also makes logical sense, since misconduct in office has been defined as "any unlawful behavior in relation to official duties by an officer intrusted in any way with the administration of law and justice, or, as otherwise defined, any act or omission in breach of a duty of public concern by one who has accepted public office."

12

1 Burdick, The Law of Crime (1946), § 272, p 388. And Burdick explains that this offense is "broad enough to include malfeasance, misfeasance, and nonfeasance." *Id*. It is hard to imagine how, absent a duty, one could be charged with nonfeasance, since nonfeasance is "omit[ting] to do any act which is required of [a public officer] by the duties of his office[.]" Perkins & Boyce, p 540.

In *Coutu*, the analysis of this element, too, was straightforward: the Court simply noted that "the Legislature defined in part the powers and duties of deputy sheriffs," citing MCL 51.75 ("The sheriff shall have the charge and custody of the jails of his county, and of the prisoners in the same; and shall keep them himself, or by his deputy or jailer."); MCL 51.76(2) (listing the services that must be provided by each county sheriff's department); and MCL 51.221 ("A sheriff, undersheriff, or deputy sheriff of a county of this state may serve or execute civil or criminal process issued by a court of this state, and have and exercise all the powers and duties of constables."). *Coutu*, 459 Mich at 355.

The majority in this case errs in its analysis because it fails to recognize that no like statutory provisions exist defining the duties of federal law enforcement officers serving on a state task force. Citing MCL 764.15d(1), the majority asserts that "the duties of defendants were the obligations of the HST . . . ." This assertion is perplexing, however, since the statute does not refer to the HST or any particular task force or require anyone to serve on or perform any particular tasks for such a task force. The majority's analysis simply conflates statutory authority to perform certain tasks with a statutory duty to do so.

Perhaps recognizing the weakness in its position, the majority selects a broad but inapplicable definition of "duty" as " 'something that one is expected or required to do by moral or legal obligation.' " However, a much more apt definition in this context is "an

13

action or task required by a person's position or occupation; function[.]" Dictionary.com <https://www.dictionary.com/browse/duty?s=t> (accessed June 28, 2019) [https://perma.cc/6RRH-2DQA]. Here, unlike in *Coutu*, the statute does not impose any duties on anyone; indeed, it does not require any particular person in any particular position to do any particular thing.

But the absence of a statutory duty is not surprising since it is apparent, based on the plain language of MCL 764.15d, that the statute was intended to allow federal law enforcement officers to enforce Michigan law to the same extent as a state or local officer, but only in limited circumstances and for limited purposes. The statute does not purport to create a new office or to prescribe the duties of any such office. Thus, for example, the statute does not obligate federal officers to enforce state law—nor could it, since the Legislature has no power to impose job duties or conditions of employment on federal law enforcement officers. Instead, any such duties were simply a matter of custom or informal agreement and, as in *Langdon*, "the[se] duties, such as they are, can be changed at the will of the superior, since no rule of law or well defined custom forbids it." *Langdon*, 40 Mich at 685. In sum, the third *Coutu* element has also not been established.

> 4. TO CONSTITUTE A PUBLIC OFFICE, THE DUTIES MUST BE PERFORMED INDEPENDENTLY AND WITHOUT CONTROL OF A SUPERIOR POWER OTHER THAN THE LAW, UNLESS THEY BE THOSE OF AN INFERIOR OR SUBORDINATE OFFICE, CREATED OR AUTHORIZED BY THE LEGISLATURE, AND BY IT PLACED UNDER THE GENERAL CONTROL OF A SUPERIOR OFFICER OR BODY

As to the fourth *Coutu* element, no one contends that defendants' duties (whatever those might be—see above) as federal law enforcement officers assigned to the HST are "performed independently and without control of a superior power other than the law . . . ."

14

Indeed, like the deputy sheriffs at issue in *Coutu*, it is clear that they are not. Therefore, the pertinent inquiry is, assuming that their positions were created or authorized by the Legislature, whether those positions were placed by the Legislature "under the general control of a superior officer or body."[6] In *Coutu*, we held that this element was satisfied "[b]ecause the Legislature ha[d] authorized the appointment of deputy sheriffs, an inferior or subordinate office to that of sheriff," pursuant to MCL 51.70. *Coutu*, 459 Mich at 355. The majority asserts that since defendants "were empowered to act only insofar as they were participating in a joint investigation or acting at the request of state officers" under MCL 764.15d(1)(c)(*iii*) and (*iv*), "[t]hey were under the general control of HST." However, the statute does not provide for the appointment of members to a joint investigation or task force, create a command structure, or describe how any such joint investigation or task force will be administered. And I could locate no law or regulation setting forth these details for HSTs in particular. Although defendants may have deferred to the MSP troopers when involved in state investigations, they did so as a matter of custom or informal agreement—there is no law or regulation requiring them to do so. Thus, the fourth *Coutu* element has not been established.

---

[6] In *Hawkins*, the court derived the following rule from the many cases it reviewed: "[Those cases] hold . . . quite generally that an officer's duties must be prescribed by law, and that he must be independent in the exercise of them, and not subject to orders from a superior as to the nature or discharge of his duties, with the exception of some assistants, such as Assistant Attorneys General, secretaries, and the like, created by law, with salaries fixed by law." *Hawkins*, 257 P at 414.

5. TO CONSTITUTE A PUBLIC OFFICE, THE POSITION MUST HAVE SOME PERMANENCY AND CONTINUITY, AND NOT BE ONLY TEMPORARY OR OCCASIONAL

The fifth *Coutu* element requires us to analyze whether defendants' positions as members of the HST "have some permanency and continuity" and are not "only temporary or occasional." *Coutu*, 459 Mich at 354. See also Mechem, A Treatise on the Law of Public Offices and Officers (1890), § 8, p 6 ("[C]ertainly a position which is merely temporary and local cannot ordinarily be considered an office."). As our Court explained in *Underwood v McDuffee*, 15 Mich 361, 366-367 (1867):

> The term "*officer*" . . . can only be taken to refer to such offices as have some degree of permanence, and are not created by a temporary nomination for a single and transient purpose. A designation of a person to do some one act of duty, with no official tenure except as incident to that transitory function, can not make him a public officer, without involving a great absurdity. Every public office includes duties which are to be performed constantly, or as occasion arises, during some continuous tenure.

In *Coutu*, again, this element was easily satisfied since "deputy sheriffs are generally positions of permanent employment." *Coutu*, 459 Mich at 356. Here, the picture is more complicated. The majority bases its conclusion that defendants' positions are sufficiently permanent and continuous on (1) the fact that "the statutory delegation of the state's police power to qualifying federal agents . . . has been codified since 1999,"[7] (2) the HST itself has been in existence at least three years, and (3) defendants were on long-term assignments and worked solely with the HST. I believe this analysis misses the mark.

---

[7] Although MCL 764.15d was last amended in 1999, see 1999 PA 64, it was first enacted in 1987, see 1987 PA 256.

16

As noted above, MCL 764.15d does not create a permanent position on any particular task force or outline the duties of a task force member or how a member is appointed. Instead, it simply authorizes federal law enforcement officers to enforce state law in limited circumstances and for a limited purpose. Indeed, most of the work authorized by the statute is carefully circumscribed and quite obviously "temporary or occasional." For example, to enforce Michigan law, a federal law enforcement officer must possess a state felony arrest warrant, see MCL 764.15d(1)(c)(*i*), or receive "positive information from an authoritative source" that another federal or state law enforcement officer is in possession of same, see MCL 764.15d(1)(c)(*ii*). Or, the federal officer may "respond[] to an emergency." See MCL 764.15d(1)(c)(*v*). The acts of executing an arrest warrant and responding to an emergency do not require any degree of permanence or continuity. Nor would "acting pursuant to *the request*" of state or local law enforcement on one occasion—or even more than one occasion—be sufficient to satisfy the permanence requirement. See MCL 764.15d(1)(c)(*iv*) (emphasis added). So, we are left with the question whether participation in a joint investigation or task force under MCL 764.15d(1)(c)(*iii*) is sufficient to satisfy the permanence requirement.

As a general matter, a task force is not, by its nature, a permanent or continuing entity. Instead, it is organized and implemented to solve a specific problem. See Dictionary.com <https://www.dictionary.com/browse/task-force> (accessed June 17, 2019) [https://perma.cc/K6K2-HUDU] (defining a "task force" as "a group or committee, usually of experts or specialists, formed for analyzing, investigating, or solving a specific problem"). As noted, we have been provided with no law or regulation permanently establishing the HST or describing the tenure of its members. The description on the

17

MSP's website contains no reference to federal officers serving as members of the HST or any indication of the likely duration of any member's service on the team.[8] Nor does the record support the majority's conclusion that a Border Patrol agent's membership on the HST had any particular tenure or degree of permanency; instead, it appears that membership on the team fluctuated with the needs of the United States Border Patrol and the MSP. Defendant Nicholson had only been a member of the HST for six weeks prior to the search at issue in this case, and before joining the HST, he had been a member of a different task force in Detroit for a period of time.

For the above reasons, defendants' transitory assignments to the HST do not reflect the degree of permanence and continuity that we would typically associate with a public office. Therefore, the fifth *Coutu* element has not been established.

## C. I BELIEVE THE OATH IS A REQUIRED ELEMENT, AND THAT REQUIREMENT IS NOT SATISFIED HERE

Lastly, the majority states that "whether a defendant has taken an oath is 'of assistance' in this determination." While I concede that we appeared to say as much in *Freedland*, 308 Mich at 458, and did say as much in *Coutu*, 459 Mich at 355 ("Oath and bond requirements are also of assistance in determining whether a position is a public office."), this observation was dictum and appears to be a misunderstanding of the authorities those opinions relied upon.

In *Langdon*, this Court clearly believed the taking of an official oath to be a requisite element of its determination of whether the chief clerk in the city assessor's office was an

---

[8] See note 3 of this opinion.

employee or a public officer for purposes of a quo warranto action. Justice COOLEY stated the oath requirement as part of his general rule for determining whether a person was an officer:

> An office is a special trust or charge created by competent authority. If not merely honorary, certain duties will be connected with it, the performance of which will be the consideration for its being conferred upon a particular individual, who for the time will be the officer. The officer is distinguished from the employee in the greater importance, dignity and independence of his position; *in being required to take an official oath*, and perhaps to give an official bond; in the liability to be called to account as a public offender for misfeasance or nonfeasance in office, and usually, though not necessarily, in the tenure of his position. In particular cases other distinctions will appear which are not general. [*Langdon*, 40 Mich at 682-683 (emphasis added).]

Similarly, in *Hawkins*, the court initially observed that:

> From the foregoing and many other authorities examined it appears that various elements are considered requisite to a public office. *Some decisions hold that the taking of an official oath is necessary to constitute a position an office*; others hold that the giving of an official bond is necessary; still others hold that the issuance of a commission or certificate of appointment is necessary; some decisions hold all three requisite. [*Hawkins*, 257 P at 414 (emphasis added).][9]

Later, after quoting at length from *Langdon*, the court stated:

> We are not informed if he took an oath of office, and, sharing the views of Judge Cooley, above quoted, we hold it is not decisive if he did. Taking an official oath cannot make a position an office, although an office cannot be held legally in this state without the taking of the oath; but we look for other tests. [*Id.* at 416.]

---

[9] One such case it cited was *Lindsey v Attorney General*, 33 Miss 508, 519 (1857) ("[T]here must be some fixed term prescribed for his continuance in office; he must give bond, and take an oath, faithfully to discharge the duties of his office; a commission must issue, investing him with the authority to enter upon the office.").

This passage is perhaps best understood as clarifying that the taking of an official oath, by itself, is insufficient to make a position a public office. In any event, it is clear that the *Hawkins* court believed that an oath was required. See *id.* at 418 (stating, immediately after reciting the five indispensable elements quoted in *Freedland* and *Coutu*, that "[i]n addition, in this state, an officer must take and file an official oath, hold a commission or other written authority, and give an official bond, if the latter be required by proper authority").

In *Freedland*, without explanation, this Court pruned this latter statement from its quotation of the five indispensable elements. Next, we quoted only a portion of the general rule from *Langdon*, as follows: " 'The officer is distinguished from the employee in the greater importance, dignity and independence of his position; *in being required to take an official oath*, and perhaps to give an official bond.' " *Freedland*, 308 Mich at 458, quoting *Langdon*, 40 Mich at 682 (emphasis added). Then, we observed that "[t]hese factors, while not controlling, are of assistance in doubtful cases." *Freedland*, 308 Mich at 458. It is unclear why we made this observation or where it came from; in any event, we never addressed the defendant's specific arguments as to why he was not a public officer, including that "[h]e took no oath of office[.]" *Id.* at 454. So, the statement was clearly obiter dictum. See, e.g., *People v Lown*, 488 Mich 242, 267 n 46; 794 NW2d 9 (2011) ("Obiter dicta, or 'dicta,' are not binding precedent. Rather, they are statements that are not essential to determination of the case at hand and, therefore, 'lack the force of an adjudication.' "), quoting *Wold Architects & Engineers v Strat*, 474 Mich 223, 232 n 3; 713 NW2d 750 (2006).

20

In *Coutu*, we repeated both the abbreviated quotation of the general rule from *Langdon*, see *Coutu*, 459 Mich at 354, citing *Freedland*, 308 Mich at 458, and *Freedland*'s dictum that "[o]ath and bond requirements are also of assistance in determining whether a position is a public office," *Coutu*, 459 Mich at 355. But, significantly, immediately after analyzing the five indispensable elements, we noted that "[f]inally, deputy sheriffs are required to take an oath before entering upon their duties of office." *Id*. at 356, citing MCL 51.73.[10]

I would disavow the dictum in *Freedland* and hold, consistently with *Langdon*, *Hawkins*, and Const 1963, art 11, § 1, that an oath is a necessary prerequisite to a finding that a person is a public officer for purposes of a misconduct in office charge. Here, defendants were not required to take an oath under the Michigan Constitution or any other oath pertaining to their duties as members of the task force before commencing their assignment. Indeed, the statute that authorizes them to enforce state law makes no reference to an oath. See MCL 764.15d.

---

[10] MCL 51.73 provides that "every such under sheriff or deputy shall, before he enters upon the duties of his office, take the oath prescribed by the twelfth article of the constitution of this state." As the Compiler's Note makes clear, this section originally referred to the Constitution of 1835; the oath is now set forth in Const 1963, art 11, § 1, which provides as follows:

> All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of .......... according to the best of my ability. No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust.

The majority relies on the fact that defendants were required to take a promissory oath[11] to serve as Border Patrol agents for the United States government, but that oath promises faithful performance of the duties of a Border Patrol agent and makes no reference to the faithful performance of any duties relating to Michigan law or service on a task force.[12] Justice COOLEY's analysis of the oath requirement in *Langdon* is instructive here:

> Nor do we find in the facts stipulated or in any law or ordinance the requirement of an official oath. It is said that the usual oath of office has sometimes and perhaps always been administered, but why administered we do not understand. The fact of its being taken cannot prove that the clerk is an officer; at most, it could only evidence his belief that he was one, or perhaps his caution to observe all forms that possibly might turn out to be essential. It was, we think, a needless ceremony. [*Langdon*, 40 Mich at 685.]

Properly understood, Justice COOLEY was stating the seemingly unremarkable proposition that the oath requirement could not be satisfied by the taking of any old oath; instead, it could only be satisfied by the taking of an official oath required for the position by law or ordinance. See *People v Cain*, 498 Mich 108, 159; 869 NW2d 829 (2015) (VIVIANO, J.,

---

[11] See *People v Cain*, 498 Mich 108, 159; 869 NW2d 829 (2015) (VIVIANO, J., dissenting) (explaining that a " 'promissory oath' . . . obliges the swearer to 'observe a specified course of conduct in the future' ") (citation omitted).

[12] Border Patrol agents are required to take the following oath of office:

> I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God. [United States Office of Personnel Management, *Appointment Affidavits*, Standard Form 61 (revised August 2002), available at <https://perma.cc/4PA4-76FQ>.]

It is undisputed that defendants took the requisite federal oath of office.

dissenting) ("A jury becomes a jury when its members take the *juror's oath*—not just any old oath.").

In this case, to the extent that defendants' positions are correctly described by the majority as "federal agent task force members enforcing Michigan law," defendants took no oath to faithfully perform any duties attendant to such a position and therefore, for this additional reason, may not be deemed public officers for purposes of a common-law misconduct in office charge for work done in that capacity.[13]

For these reasons, I do not believe that the prosecution has met its burden of establishing that defendants were public officers for purposes of a misconduct in office charge. In particular, *Coutu* elements 1, 3, 4, and 5 were not established; additionally, defendants were not required to take an oath as HST members, which I believe is also requisite to finding that the position is a public office. Therefore, I would affirm the Court of Appeals' judgment vacating defendants' convictions.

David F. Viviano

---

[13] I take no position on whether defendants would be considered public officers for purposes of a common-law misconduct in office charge for work done in their capacity as Border Patrol agents, because that issue is not before us.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellant,

v                                              No. 156827

TERENCE MITCHELL BRUCE,

     Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellant,

v                                              No. 156828

STANLEY LYLE NICHOLSON,

     Defendant-Appellee.

_____

CLEMENT, J. (*dissenting*).

Under the "public office" test articulated in *People v Coutu*, a position is not a "public office" if it was not "created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature." 459 Mich 348, 354; 589 NW2d 458 (1999) (cleaned up). Defendants' positions as federal agents don't meet that criterion. Nor do their positions on the task force. Justice VIVIANO's dissent, *ante* at 7-10, reaches the same conclusions and thus further concludes, correctly in

my view, that without that "indispensable" element, *Coutu*, 459 Mich at 354, the prosecutor

cannot prove that defendants held public office.  For that reason, I respectfully dissent.

Elizabeth T. Clement